*367 Justice Breyer
delivered the opinion of the Court.
We here consider whether a federal statute that prohibits States from enacting any law “related to” a motor carrier “price, route, or service” pre-empts two provisions of a Maine tobacco law, which regulate the delivery of tobacco to customers within the State. 49 U. S. C. §§ 14501(c)(1), 41713(b)(4)(A); see Me. Rev. Stat. Ann., Tit. 22, §§ 1555-C(3)(C), 1555-D (second sentence) (2004). We hold that the federal law pre-empts both provisions.
I
A
In 1978, Congress “determin[ed] that ‘maximum reliance on competitive market forces’” would favor lower airline fares and better airline service, and it enacted the Airline *368 Deregulation Act. Morales v. Trans World Airlines, Inc., 504 U. S. 374, 378 (1992) (quoting 49 U. S. C. App. § 1302(a)(4) (1988 ed.)); see 92 Stat. 1705. In order to “ensure that the States would not undo federal deregulation with regulation of their own,” that Act “included a pre-emption provision” that said “no State . . . shall enact or enforce any law . . . relating to rates, routes, or services of any air carrier.” Morales, supra, at 378; 49 U. S. C. App. § 1305(a)(1) (1988 ed.).
In 1980, Congress deregulated trucking. See Motor Carrier Act of 1980, 94 Stat. 793. And a little over a decade later, in 1994, Congress similarly sought to pre-empt state trucking regulation. See Federal Aviation Administration Authorization Act of 1994,108 Stat. 1605-1606; see also ICC Termination Act of 1995, 109 Stat. 899. In doing so, it borrowed language from the Airline Deregulation Act of 1978 and wrote into its 1994 law language that says: “[A] State ... may not enact or enforce a law . . . related to a price, route, or service of any motor carrier ... with respect to the transportation of property.” 49 U. S. C. § 14501(c)(1); see also § 41713(b)(4)(A) (similar provision for combined motor-air carriers).
The State of Maine subsequently adopted An Act To Regulate the Delivery and Sales of Tobacco Products and To Prevent the Sale of Tobacco Products to Minors, 2003 Me. Acts p. 1089, two sections of which are relevant here. The first section forbids anyone other than a Maine-licensed tobacco retailer to accept an order for delivery of tobacco. Me. Rev. Stat. Ann., Tit. 22, § 1555-C(1). It then adds that, when a licensed retailer accepts an order and ships tobacco, the retailer must “utilize a delivery service” that provides a special kind of recipient-verification service. § 1555-C(3)(C). The delivery service must make certain that (1) the person who bought the tobacco is the person to whom the package is addressed; (2) the person to whom the package is addressed is of legal age to purchase tobacco; (3) the person to whom *369 the package is addressed has himself or herself signed for the package; and (4) the person to whom the package is addressed, if under the age of 27, has produced a valid government-issued photo identification with proof of age. Ibid. Violations are punishable by civil penalties. See §§ 1555-C(3)(E) to C(3)(F) (first offense up to $1,500; subsequent offenses up to $5,000).
The second section forbids any person “knowingly” to “transport” a “tobacco product” to “a person” in Maine unless either the sender or the receiver has a Maine license. §1555-D. It then adds that a “person is deemed to know that a package contains a tobacco product” (1) if the package is marked as containing tobacco and displays the name and license number of a Maine-licensed tobacco retailer; or (2) if the person receives the package from someone whose name appears on a list of m-licensed tobacco retailers that Maine’s attorney general distributes to various package-delivery companies. Ibid, (emphasis added); see also §§ 1555— C(3)(B), 1555-D(1). Violations are again punishable by civil penalties. § 1555-D(2) (up to $1,500 per violation against violator and/or violator’s employer).
B
Respondents, several transport carrier associations, brought this lawsuit in federal court, claiming that federal law pre-empts several sections of Maine’s statute. The District Court held (among other things) that federal law preempts the portions of the two sections we have described, namely, the “recipient-verification” provision (§ 1555-C(3)(C)) and the “deemed to know” provision (the second sentence of § 1555-D). See 377 F. Supp. 2d 197, 220 (Me. 2005). On appeal, the Court of Appeals for the First Circuit agreed that federal law pre-empted the two provisions. 448 F. 3d 66, 82 (2006). We granted certiorari to review these determinations. 551 U. S. 1144 (2007).
*370 II
A
In Morales, this Court interpreted the pre-emption provision in the Airline Deregulation Act of 1978. See 504 U. S., at 378. And we follow Morales in interpreting similar language in the 1994 Act before us here. We have said that “when judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its judicial interpretations as well.” Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit, 547 U. S. 71, 85 (2006) (internal, quotation marks and alteration omitted). Here, the Congress that wrote the language before us copied the language of the air-carrier pre-emption provision of the Airline Deregulation Act of 1978. Compare 49 U. S. C. §§ 14501(c)(1), 41713(b)(4)(A), with 49 U. S. C. App. § 1305(a)(1) (1988 ed.); see also H. R. Conf. Rep. No. 103-677, pp. 82-83, 85 (1994) (hereinafter H. R. Conf. Rep.). And it did so fully aware of this Court’s interpretation of that language as set forth in Morales. See H. R. Conf. Rep., at 83 (motor carriers will enjoy “the identical intrastate preemption of prices, routes and services as that originally contained in” the Airline Deregulation Act); ibid, (expressing agreement with “the broad preemption interpretation adopted by the United States Supreme Court in Morales”)-, id., at 85.
In Morales, the Court determined: (1) that “[s]tate enforcement actions having a connection with, or reference to,” carrier “‘rates, routes, or services’ are pre-empted,” 504 U. S., at 384 (emphasis added); (2) that such pre-emption may occur even if a state law’s effect on rates, routes, or services “is only indirect,” id., at 386 (internal quotation marks omitted); (3) that, in respect to pre-emption, it makes no difference whether a state law is “consistent” or “inconsistent” with federal regulation, id., at 386-387 (emphasis deleted); *371 and (4) that pre-emption occurs at least where state laws have a “significant impact” related to Congress’ deregulatory and pre-emption-related objectives, id., at 390. The Court described Congress’ overarching goal as helping ensure transportation rates, routes, and services that reflect “maximum reliance on competitive market forces,” thereby stimulating “efficiency, innovation, and low prices,” as well as “variety” and “quality.” Id., at 378 (internal quotation marks omitted). Morales held that, given these principles, federal law pre-empts States from enforcing their consumer-fraud statutes against deceptive airline-fare advertisements. Id., at 391. See American Airlines, Inc. v. Wolens, 513 U. S. 219, 226-228 (1995) (federal law pre-empts application of a State’s general consumer-protection statute to an airline’s frequent flyer program).
Finally, Morales said that federal law might not pre-empt state laws that affect fares in only a “tenuous, remote, or peripheral. . . manner,” such as state laws forbidding gambling. 504 U. S., at 390 (internal quotation marks omitted). But the Court did not say where, or how, “it would be appropriate to draw the line,” for the state law before it did not “present a borderline question.” Ibid, (internal quotation marks omitted); see also Wolens, supra, at 226.
B
In light of Morales, we find that federal law pre-empts the Maine laws at issue here. Section 1555-C(3)(C) of the Maine statute forbids licensed tobacco retailers to employ a “delivery service” unless that service follows particular delivery procedures. Me. Rev. Stat. Ann., Tit. 22, § 1555-C(3)(C). In doing so, it focuses on trucking and other motor-carrier services (which make up a substantial portion of all “delivery services,” § 1551(1-C)), thereby creating a direct “connection with” motor-carrier services. See Morales, 504 U. S., at 384.
At the same time, the provision has a “significant” and adverse “impact” in respect to the federal Act’s ability to *372 achieve its pre-emption-related objectives. Id., at 390. The Solicitor General and the carrier associations claim (and Maine does not deny) that the law will require carriers to offer a system of services that the market does not now provide (and which the carriers would prefer not to offer). And even were that not so, the law would freeze into place services that carriers might prefer to discontinue in the future. The Maine law thereby produces the very effect that the federal law sought to avoid, namely, a State’s direct substitution of its own governmental commands for “competitive market forces” in determining (to a significant degree) the services that motor carriers will provide. Id., at 378 (internal quotation marks omitted).
We concede that the regulation here is less “direct” than it might be, for it tells shippers what to choose rather than carriers what to do. Nonetheless, the effect of the regulation is that carriers will have to offer tobacco delivery services that differ significantly from those that, in the absence of the regulation, the market might dictate. And that being so, “treating sales restrictions and purchase restrictions differently for pre-emption purposes would make no sense.” Engine Mfrs. Assn. v. South Coast Air Quality Management Dist., 541 U. S. 246, 255 (2004). If federal law preempts state efforts to regulate, and consequently to affect, the advertising about carrier rates and services at issue in Morales, it must pre-empt Maine’s efforts to regulate carrier delivery services themselves.
Section 1555-D’s “deemed to know” provision applies yet more directly to motor-carrier services. The provision creates a conclusive presumption of carrier knowledge that a shipment contains tobacco when it is marked as originating from a Maine-licensed tobacco retailer or is sent by anyone Maine has specifically identified as an unlicensed tobacco retailer. That presumption means that the Maine law imposes civil liability upon the carrier, not simply for its knowing *373 transport of (unlicensed) tobacco, but for the carrier’s failure sufficiently to examine every package. The provision thus requires the carrier to check each shipment for certain markings and to compare it against the Maine attorney general’s list of proscribed shippers. And it thereby directly regulates a significant aspect of the motor carrier’s package pickup and delivery service. In this way it creates the kind of state-mandated regulation that the federal Act pre-empts.
Maine replies that the regulation will impose no significant additional costs upon carriers. But even were that so (and the carriers deny it), Maine’s reply is off the mark. As with the recipient-verification provision, the “deemed to know” provision would freeze in place and immunize from competition a service-related system that carriers do not (or in the future might not) wish to provide. Supra, at 371-372. To allow Maine to insist that the carriers provide a special checking system would allow other States to do the same. And to interpret the federal law to permit these, and similar, state requirements could easily lead to a patchwork of state service-determining laws, rules, and regulations. That state regulatory patchwork is inconsistent with Congress’ major legislative effort to leave such decisions, where federally unregulated, to the competitive marketplace. See H. R. Conf. Rep., at 87. If federal law pre-empts state regulation of the details of an air carrier’s frequent flyer program, a program that primarily promotes carriage, see Wolens, supra, at 226-228, it must pre-empt state regulation of the essential details of a motor carrier’s system for picking up, sorting, and carrying goods — essential details of the carriage itself.
C
Maine’s primary arguments focus upon the reason why it has enacted the provisions in question. Maine argues for an exception from pre-emption on the ground that its laws help it prevent minors from obtaining cigarettes. In Maine’s *374 view, federal law does not pre-empt a State’s efforts to protect its citizens’ public health, particularly when those laws regulate so dangerous an activity as underage smoking.
Despite the importance of the public health objective, we cannot agree with Maine that the federal law creates an exception on that basis, exempting state laws that it would otherwise pre-empt. The Act says nothing about a public health exception. To the contrary, it explicitly lists a set of exceptions (governing motor vehicle safety, certain local route controls, and the like), but the list says nothing about public health. See 49 U. S. C. §§ 14501(c)(2) to (c)(3); see also § 41713(b)(4)(B). Maine suggests that the provision’s history indicates that Congress’ primary concern was not with the sort of law it has enacted, but instead with state “economic” regulation. See, e. g., H. R. Conf. Rep., at 88; see also Columbus v. Ours Garage & Wrecker Service, Inc., 536 U. S. 424, 440 (2002). But it is frequently difficult to distinguish between a State’s “economic’’-related and “health”-related motivations, see infra, at 375, and, indeed, the parties vigorously dispute Maine’s actual motivation for the laws at issue here. Consequently, it is not surprising that Congress declined to insert the term “economic” into the operative language now before us, despite having at one time considered doing so. See S. Rep. No. 95-631, p. 171 (1978) (reprinting Senate bill).
Maine’s argument for an implied “public health” or “tobacco” exception to federal pre-emption rests largely upon (1) legislative history containing a list of nine States, with laws resembling Maine’s, that Congress thought did not regulate “intrastate prices, routes and services of motor carriers,” see H. R. Conf. Rep., at 86; and (2) the Synar Amendment, a law that denies States federal funds unless they forbid sales of tobacco to minors, see 42 U. S. C. §§ 300x-26(a)(1), (b)(1). The legislative history, however, does not suggest Congress made a firm judgment about, or even focused upon, the issue now before us. And the Synar *375 Amendment nowhere mentions the particular state enforcement method here at issue; indeed, it does not mention specific state enforcement methods at all.
Maine’s inability to find significant support for some kind of “public health” exception is not surprising. “Public health” does not define itself. Many products create “public health” risks of differing kind and degree. To accept Maine’s justification in respect to a rule regulating services would legitimate rules regulating routes or rates for similar public health reasons. And to allow Maine directly to regulate carrier services would permit other States to do the same. Given the number of States through which carriers travel, the number of products, the variety of potential adverse public health effects, the many different kinds of regulatory rules potentially available, and the difficulty of finding a legal criterion for separating permissible from impermissible public-health-oriented regulations, Congress is unlikely to have intended an implicit general “public health” exception broad enough to cover even the shipments at issue here.
This is not to say that this federal law generally pre-empts state public health regulation: for instance, state regulation that broadly prohibits certain forms of conduct and affects, say, truckdrivers, only in their capacity as members of the public (e.g., a prohibition on smoking in certain public places). We have said that federal law does not pre-empt state laws that affect rates, routes, or services in “too tenuous, remote, or peripheral a manner.” Morales, 504 U. S., at 390 (internal quotation marks omitted). And we have written that the state laws whose “effect” is “forbidden” under federal law are those with a “significant impact” on carrier rates, routes, or services. Id., at 388, 390 (emphasis added).
In this ease, the state law is not general, it does not affect truckers solely in their capacity as members of the general public, the impact is significant, and the connection with trucking is not tenuous, remote, or peripheral. The state *376 statutes aim directly at the carriage of goods, a commercial field where carriage by commercial motor vehicles plays a major role. The state statutes require motor-carrier operators to perform certain services, thereby limiting their ability to provide incompatible alternative services; and they do so simply because the State seeks to enlist the motor-carrier operators as allies in its enforcement efforts. Given these circumstances, from the perspective of pre-emption, this case is no more “borderline” than was Morales. Id., at 390 (internal quotation marks omitted); see also Wolens, 513 U. S., at 226.
Maine adds that it possesses legal authority to prevent any tobacco shipments from entering into or moving within the State, and that the broader authority must encompass the narrower authority to regulate the manner of tobacco shipments. But even assuming purely for argument’s sake that Maine possesses the broader authority, its conclusion does not follow. To accept that conclusion would permit Maine to regulate carrier routes, carrier rates, and carrier services, all on the ground that such regulation would not restrict carriage of the goods as seriously as would a total ban on shipments. And it consequently would severely undermine the effectiveness of Congress’ pre-emptive provision. Indeed, it would create the very exception that we have just rejected, extending that exception to all other products a State might ban. We have explained why we do not believe Congress intended that result. Supra, at 373-375 and this page.
Finally, Maine says that to set aside its regulations will seriously harm its efforts to prevent cigarettes from falling into the hands of minors. The Solicitor General denies that this is so. He suggests that Maine, like other States, can prohibit all persons from providing tobacco products to minors (as it already has, see Me. Rev. Stat. Ann., Tit. 22, § 1555-B(2) (Supp. 2007)); that it can ban all non-face-to-face sales of tobacco; that it might pass other laws of general *377 (non-carrier-specific) applicability; and that it can, if necessary, seek appropriate federal regulation (see, e.g., H. R. 4081, 110th Cong., 1st Sess. (2007) (proposed bill regulating tobacco shipment); H. R. 4128, 110th Cong., 1st Sess., §§ 1411-1416, pp. 577-583 (2007) (proposed bill providing criminal penalties for trafficking in contraband tobacco)). Regardless, given Morales, where the Court held that federal law pre-empts state consumer-protection laws, we find that federal law must also pre-empt Maine’s efforts directly to regulate carrier services.
For these reasons, the judgment of the Court of Appeals is affirmed.

It is so ordered.