Murtagh, Thomas R., J.

INTRODUCTION

The plaintiff, Alberg Oliveira (“Oliveira”), filed this action on April 3, 2009, against the defendant, Advanced Delivery Systems, Inc. (“ADS”), alleging nonpayment of wages in violation of G.L.c. 149, §148 (“§148B”) (Count I), conversion (Count II), and unjust enrichment (Counts III, IV and V). This matter is before the court on Oliveira’s Motion for Partial Summary Judgment on the issue of whether Oliveira was an independent contractor or employee of ADS. For the reasons discussed below, Oliveira’s motion is ALLOWED.

BACKGROUND

The undisputed facts, as well as those taken in the light most favorable to ADS as the nonmoving pariy, are as follows.
ADS is in the business of providing home furniture delivery management services to furniture retailers by using a system of “Owner-Operators.” Oliveira began working with ADS on February 10, 2007, and initially worked for the first two weeks as a helper to drivers making furniture deliveries. After the first two weeks, Oliveira worked as a driver making deliveries to Bob’s Discount Furniture (“Bob’s”) customers.
Oliveira reported every morning at a depot by 6:00 AM. A depot supervisor provided Oliveira a Truck Delivery Report (“TDR”), which Bob’s produced, listing each address to which Oliveira had to deliver furniture along with an expected arrival time. Oliveira wore a uniform of blue trousers and a shirt with a Bob’s logo. Before leaving the depot, Oliveira verified that furniture for his first delivery was loaded in the front of the trailer and activated a GPS device for his truck. After each delivery, Oliveira was required to call a central *403 line from the customer’s house to confirm the delivery. Until March 30, 2007, ADS classified Oliveira as a “temporary helper employee” and deducted payroll taxes from his paycheck. Prior to this date, ADS provided, supervised and paid helpers for Oliveira’s furniture deliveries. ADS also obtained workers’ compensation insurance for those individuals.
On or around March 27, 2007, Oliveira and ADS executed an Independent Truckman’s Contract (the “Contract”). From this point forward, ADS classified him as an independent contractor, as he was an Owner-Operator, and stopped deducting payroll taxes from his checks. Among other provisions of the Contract, the parties agreed that “[Oliveira] through his own business will deliver for an ADS retail customer, in a truck leased or purchased by [Oliveira], with the aid of a helper employed and paid by [Oliveira] on terms that may be agreed upon between [Oliveira] and the helper.” The parties also agreed that “[Oliveira] shall be solely responsible for the fueling, maintenance, tires, repairs, equipment, and insurance for his truck, and the other expenses of his business ... [and that Oliveira] shall direct the operation of his equipment in all respects and will determine the means of performance consistent with guidelines, if any, set forth in a contract between ADS and its retail customer.” Further, the parties agreed that Oliveira was to “furnish at his own expense workers’ compensation and employer’s liability insurance, and [to] be responsible for the payment of wages and social security and withholding taxes with respect to all his employees and . . . [to] furnish at his expense truck liability and general liability.” The Contract also included a non-compete provision where Oliveira was prohibited from providing delivery services to ADS customers within a year of terminating his relationship with ADS.
On or around March 26, 2007, both parties executed a Truck Lease Agreement (“Lease”) wherein Oliveira leased a truck from ADS. On or around March 27, 2007, ADS issued a memorandum to Oliveira describing a series of deductions that were to be withdrawn from his account. Thereafter, ADS provided Oliveira with weekly statements itemizing his earning and deduction summaries.
After Oliveira became an Owner-Operator, his job responsibilities did not significantly change. He was provided the same TDR for his delivery routes. As an Owner-Operator, however, Oliveira hired and paid for helpers to assist in making his deliveries. An agent of ADS contacted Oliveira to monitor his progress in making deliveries. He was required to send GPS transmissions from each stop, the failure to do so resulting in a fine by ADS. Upon finishing his daily deliveries, Oliveira called a central phone number to avail himself for additional assignments, otherwise known as “bail outs.”[1] At the end of each day, Oliveira handed in the day’s TDR, GPS device and the keys to the truck he used.
In January 2008, Oliveira voluntarily terminated his relationship with ADS.

DISCUSSION

Summary judgment is appropriate when there are no genuine issues of material fact and, viewing the evidence in the light most favorable to the nonmoving party, the moving party is entitled to judgment as a matter of law. Gray v. Giroux, 49 Mass.App.Ct. 436, 438 (2000); see Mass.R.Civ.P. 56(c). The party moving for summary judgment bears the burden of affirmatively demonstrating that there are no genuine issues of material fact. Pederson v. Time, Inc., 404 Mass. 14, 17 (1989), and cases cited. To meet this burden, a moving party who would not bear the burden of proof at trial may either submit affirmative evidence negating an essential element of the nonmoving party’s case or show that the nonmoving party would have no reasonable expectation of proving an essential element of its case at trial. See Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). To withstand summary judgment, the nonmoving party must articulate specific facts establishing the existence of a genuine issue of material fact. Pederson, 404 Mass. at 17, citing O’Brien, Russell&Co. v. LeMay, 370 Mass. 243, 245 (1976).

I. Preemption

ADS asserts that the Federal Aviation Administration Authorization Act of 1994 (“the FAAA Act”) expressly preempts Oliveira’s G.L.c. 149, §148B (“§148B”) claim. ADS further asserts that compliance with §148B would require it to “dramatically alter” its business model, if not terminate its business in Massachusetts altogether. Since its delivery personnel are comprised of Owner-Operators, classified as independent contractors, who are compensated based upon a percentage of the retail value of the delivered furniture, ADS maintains that this system provides the Owner-Operators with stronger business incentives than employees to provide quality service. If ADS is forced to treat the Owner-Operators as employees, it argues, §148B creates the veiy impediment to motor carrier operations that Congress intended to prevent by passing the FAAA Act.
The FAAA Act, in relevant part, provides that “a State . . . may not enact or enforce a law . . . related to a price, route, or service of any motor carrier . . . with respect to the transportation of property.” 49 U.S.C. §14501(c)(l). The Supreme Court construed this to mean that “[s]tate enforcement actions having a connection with, or reference to” carrier “rates, routes, or services” are preempted. Rowe v. New Hampshire Motor Transport Ass’n, 552 U.S. 364, 370 (2008), citing Morales v. Trans World Airlines, Inc., 504 U.S. 374, 378 (1992).[2]
Not every state law that relates to a motor carrier’s rate, route, or service is consequently preempted. State laws that only have a “tenuous, remote, or *404 peripheral” relationship to the rate, route or service of a motor carrier are not preempted. Id., citing Morales, 504 U.S. at 390. Broad or general state laws have an affect too tenuous, remote, or peripheral and are, therefore, not preempted by federal law. Rowe, 552 U.S. at 375. This applies to “state regulation that broadly prohibits certain forms of conduct and affects ... truck drivers ... only in their capacity as members of the public.” Id. Preemption occurs, however, where state laws have “a ‘significant impact’ related to Congress’ deregulatory and pre-emption-related objectives.” Id., citing Morales, 504 U.S. at 390. Preemption may occur even when the impact is indirect. Id., citing Morales, 504 U.S. at 390.
A question of preemption is a question of Congressional intent. DiFiore v. American Airlines, Inc., 6 F.Sup.2d 15, 19 (D.Mass. 2009), citing Morales, 504 U.S. at 383. ADS asserts that there is no implied exception to preemption for state employment laws. It cites to cases suggesting “that state police power enactments are not excluded from preemption.” Travers v. JetBlue Airways Corp., 2998 WL 2242391 at *2 (D.Mass. 2009).[3] Indeed, there is no implied exception as ADS suggests. Rather, there is a presumption against preemption, which is heightened in areas traditionally regulated by state law. DiFiore, 6 F.Sup.2d at 19. State laws concerning matters traditionally regulated by states are preempted only if Congress’ intent to suppress state powers is clear and manifest. Id. The District Court continues:
Congress intended to prevent states from regulating airlines specifically and thus gave the ADA (upon which the FAAA Act is based] a broad preemptive sweep. A state law is preempted when it has a significant effect on prices, routes and services. It is not clear, however, that Congress intended to exempt airlines from all state laws. In particular, it is not clear that Congress intended completely to overturn the protections for carriers’ employees traditionally provided by states to all employees. Employment laws are usually laws of general applicability, not directed to carriers, specifically, which impose bans on primary conduct and regulate carriers in their capacity as employers, not as carriers. As a result, on many occasions it has been recognized that employee’s claims affected airline prices and services only in a tenuous, remote and peripheral manner and were not preempted by the ADA. This Court concludes that, although there is no automatic exception to preemption for state employment laws of general applicability, the significant effect test ought to be applied here with sensitivity.
Id. at 22.
In Travers, the court concluded that the FAAA Act “preempts state police-power enactments to the extent that they are related to a carrier’s prices, routes, or services.” Travers, 2009 WL 2242391 at *2 (internal quotations and citation omitted). In the case at bar, the court cannot reach the same conclusion because the relation between §148B and ADS’ prices, routes or services is too tenuous and remote. The state law here, §148B, relates to the determination of an individual’s status as an employee or independent contractor for purposes of preserving employees’ rights. The court concludes that Congress did not intend to exempt motor carriers from all state laws, particularly from employment laws with such general applicability.
ADS cites American Trucking Ass’ns, Inc. v. Los Angeles, 559 F.3d 1046 (2009) (“ATA”), to argue, however, that compliance with §148B, which would purportedly force it to abandon the use of owner-operators, will significantly impact the services it provides, rendering the statute preempted. This analogy is weak. In ATA, the Cities of Los Angeles and Long Beach implemented mandatory concession agreements on motor carriers to transition from the use of independent contractors to employees. Id. at 1049. The regulation in ATA specifically targeted motor carriers and the carriage of goods. Here, §148B is a law of general applicabiliiy aimed at employers at large, not just motor carriers.[4] Any impact on the carriage of goods is indirect and is not considered to be significant.[5] “The effect of [§148B] is not to prohibit companies from utilizing independent contractors . .. [it is] to protect workers who are, in fact, employees so that they can enjoy the benefits of that status.” Derochers v. Staples, Inc., SUCV2009-4845, slip op. at 5 (Mass.Super.Ct. Jun. 7, 2010) (McEvoy, J.). Therefore, this court finds no preemption by the FAAA Act.

II. Application of General Laws c. 149, §148B

General Laws c. 149, §148 (“§148”), requires an employer to pay an employee in full, within a week of the weekly or biweekly pay period in which the employee performed the work. Whether an employer is bound by this law depends on whether the worker is an independent contractor or an employee. A worker is presumed to be an employee, and therefore covered under §148, unless the employer establishes that: “(1) the individual is free from control and direction in connection with the performance of the service both under his contract for the performance of service and in fact; and (2) the service is performed outside the usual course of the business of the employer; and (3) the individual is customarily engaging in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed.” G.L.c. 149, §148B. This is a conjunctive test where all three elements must be present for an individual to be deemed an independent contractor. Athol Daily News v. Board of Review of the Div. of Unemployment and Training, 439 Mass. 171, 175 (2003) (construing G.L.c. 151A, §2, which is virtually identical to G.L.c. 149, §148B).

A. The “Direction and Control” Element

In examining the first element, courts look to the common law of workers’ compensation to analyze the *405 employer’s right to control and direct his workers. “[W]hether the worker is supervised ‘not only as to the results to be accomplished but also as to the means and methods that are to be utilized in the performance of the work’ is examined.’ ” American Zurich Ins. Co. v. Dept. of Indus. Accidents, 2006 WL 2205085 at *3 (Mass.Super. 2006) [21 Mass. L. Rptr. 224] (citations omitted). This “test is not so narrow as to require that a worker be entirely free from direction and control from outside forces.” Athol, 439 Mass. At 177 (citation omitted).
Citing to Fucci v. Eastern Connection Operating, Inc., MICV2008-2659, slip op. (Mass.Super.Ct. Sept. 21, 2009) (Gershengom, J.) and Amero v. Townsend Oil Co., ESCV2007-1080C, slip op. (Mass.Super.Ct. Apr. 15, 2009) (Murtagh, J.), Oliveira argues that indicia of control from these cases are present here. In Fucci, a package delivery service required drivers to wear uniforms and to avail themselves by cell phone during deliveries. Fucci, MICV2008-2659, slip op. at 3. The company provided drivers with daily manifests, which required pickups and deliveries on a fixed schedule. Fucci, MICV2008-2659, slip op. at 7. On that record, the court found sufficient control and direction. Id. In Amero, an oil delivery company required its drivers to wear uniforms and to have the company logo on their trucks. Amero, ESCV2007-1080C, slip op. at 4. The drivers were instructed to deliver oil to specific customers on specific days and the company, not the drivers, determined the price of deliveries. Id, On that record, the court found sufficient control and direction. Id.
There are undisputed facts that suggest some amount of control by ADS. An agent of ADS frequently contacted Oliveira to monitor his progression on deliveries. ADS required Oliveira to contact a central number upon the completion of his deliveries to make himself available for additional deliveries. That Oliveira agreed to do so in order to receive extra compensation, as ADS asserts, does not refute its indicia of control.
There is, however, a dispute by ADS as to whether it exercised sufficient control and direction over Oliveira. ADS refutes Oliveira’s assertion that it required him to wear a uniform, provided him with manifests, and mandated a daily schedule. ADS claims those directives and requirements came from Bob’s.[6] Oliveira argues that ADS required him to send GPS transmissions from each point of delivery, fining him if he failed to do so. ADS, however, counters that the GPS transmissions allowed Bob’s customers to check the status of their deliveries online. If taken to be true, the primary purpose of the GPS system was to offer a supplementary service to Bob’s customers, not for ADS to control or direct Oliveira’s means and method of delivery. At minimum, there exists a material issue of fact which precludes a grant of summary judgment as to this first element.

B. The “Usual Course of Employer’s Business" Element

The next element looks to whether the scope of the services is performed outside the usual course of the employer’s business. G.L.c. 149, §148B(2). “Generally, a worker whose services form a regular and continuing part of the employer’s business, and whose method of operation is not such an independent business that it forms in itself a separate route through which his costs of industrial accidents can be channeled, should be found to be an employee and not an independent contractor . . . On the other hand, if the worker is performing services that are part of an independent, separate, and distinct business from that of the employer, the worker is generally considered to be an independent contractor . . .” American Zurich Ins., 2006 WL 2205085 at *4 (citations omitted).
Citing to Fucci, Oliveira argues that by claiming that the nature of its business is outsourcing rather than furniture delivery, ADS cannot meet the burden of proving that his work was outside the usual course of its business. In Fucci, the employer asserted that it was only “a marketing logistics corporation which outsource[d] transportation needs for customers.” Fucci, MICV2008-2659, slip op. at 9. The court, nonetheless, noted that the employer was in fact a courier business that picked up, transported and delivered packages for customers. Id. “In practice, [the employer] not only arranged for the pickup and delivery of its customers’ packages, but also compensated the plaintiffs to perform these non-logistical services and billed its customers for the same.” Id.
Here, ADS’ business centers on home furniture delivery. ADS claims that it manages the retailers’ delivery function while Owner-Operators perform the actual furniture deliveries to retail furniture customers’ residences pursuant to written contracts with ADS. By claiming so, it distinguishes the “management” from the “performance” function of the furniture delivery.
In practice, the court cannot find that such a distinction brings the scope of Oliveira’s services outside the usual course of ADS’ business. It is undisputed that on Oliveira’s weekly deductions, ADS deducted fuel costs, workers’ compensation payments, cargo insurance payments and charge backs for expenses paid on his behalf by ADS. Although the Lease ultimately made Oliveira responsible for the maintenance and upkeep of the truck he used, a provision allowed ADS to perform maintenance on the truck used by him. On particular occasions, ADS performed maintenance on Oliveira’s leased truck and charged him for the related costs. On the occasion that Oliveira caused damage to customers’ furniture, ADS paid such damages to Bob’s and charged corresponding costs to Oliveira. “Bail out” charges were deducted by ADS from Oliveira’s account and paid to corresponding ADS drivers. Based on these undisputed facts, the managing and performing functions of furniture delivery result in a symbiotic relationship. Without providing physical delivery of furniture, which is essential to its business, ADS’ business would not exist.
Furthermore, although the court agrees that the record does not suggest that ADS hired employees to *406 do the same work as Owner-Operators, the court notes that this is not countervailing evidence. In Fucci, the court held that “ [although the plaintiffs entered into their respective Agreements as sole proprietorships, the evidence indicated) that [the company] would only contract with the plaintiffs in business rather than personal capacities, not that the plaintiffs formed these business to channel workers’ compensation costs.” Fucci, MICV2008-2659, slip op. at 9. By its own admission, ADS only hired temporary employees in an effort to evaluate their futures as Owner-Operators. As in FUcci, the Owner-Operators did not become independent contractors in an effort to channel their own costs; rather they did so to become Owner-Operators for ADS. The court, therefore, finds that summary judgment is warranted under the second element.

C. The “Independent Enterprise” Element

Although it is not necessary to the court’s determination that Oliveira is entitled to summary judgment, the court shall briefly examine the final element. The final element, which also favors Oliveira, looks to whether the worker is “customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed.” G.L.c. 149, §148B(3). “Whether the service in question could be viewed as an independent trade or business because the worker is capable of performing the service to anyone wishing to avail themselves of the services, or, conversely, whether the nature of the business compels the worker to depend on a single employer for the continuation of the services.” Athol, 439 Mass. at 181. Ultimately, the question is “whether the worker is wearing the hat of an employee of the employing company or is wearing the hat of his own independent enterprise.” Boston Bicycle Couriers, Inc. v. Deputy Director of the Div. of Employment & Training, 56 Mass.App.Ct. 473 (2002).
ADS asserts that Oliveira was engaged in an independently established business because he took steps to become an independent contractor — after which he operated his business for more than a year, hiring his own employees and earning substantial amounts based on the retail value of the furniture he delivered. The undisputed facts demonstrate, to the contrary, that Oliveira was not an entrepreneur operating an independently established business. Oliveira did not have his own furniture delivery business prior to joining ADS. Oliveira never solicited his services nor did he work for anyone other than ADS during his time as an Owner-Operator. His earnings and deliveries stemmed from his account with Bob’s, which was originally supplied by ADS. Furthermore, since leaving ADS, Oliveira has not operated his own furniture-delivery business. These undisputed facts indicate that he was “wearing the hat” of ADS as an Owner-Operator. The court, therefore, finds that summary judgment is warranted under the third element.
ORDER
For the foregoing reasons, it is hereby ORDERED that Oliveira’s Motion for Partial Summary Judgment is ALLOWED. The court, therefore, concludes that Oliveira is ADS’ employee for purposes of G.L.c. 149, §148.

 “Bail outs” refer to situations where ADS sends an available driver to assist another who is unable to complete deliveries assigned by the day’s TDR.

 Morales dealt with the preemption provision of the Aurline Deregulation Act of 1978 (“the ADA Act”). As Congress incorporated the same preemption provision from the ADA Act into the FAAA Act, the Supreme Court used the same preemption analysis in Rowe as it did in Morales. Rowe, 552 U.S. at 370-71.

 ADS also cites to Brown v. United Air Lines, Inc., 656 F.Sup.2d 244, 248 (D.Mass. 2009), highlighting that “Rowe stands for the proposition that courts should not imply broad exceptions to the preemption provision for areas of traditional state concern.”

 Furthermore, in Rowe, the Court found significant impact because the state statutes in question “[did] not affect truckers solely in their capacity as members of the general public ... [because] [t]he state statutes aim[ed] directly at the carriage of goods ...” Rowe, 552 U.S. at 375. Here, the scope of §148B is general in nature as it applies to motor carriers just as it would to any member of the general public.

 ADS also cites to Central Transport v. Michigan. Public Service Commission, 223 Mich.App. 288 (1997), in supporting its argument. This analogy, too, is weak. In Central Transport, the state law in question prohibited motor carriers from hiring owner-operators. The court found significant impact, because the law was not general or broad as it was directly aimed at motor carriers.

 A factual distinction worth noting between Fucci and the case at bar is that in Fucci, the employees were required to wear uniforms bearing their employer’s name while Oliveira was required to wear uniforms bearing Bob’s logo, not ADS’s.