O’Donnell, J.
{¶ 1} The United States District Court for the Southern District of Ohio, Eastern Division, submitted two certified questions of Ohio law in accordance with S.Ct.Prac.R. 9.01:
1. Does the 2006 version or the 1989 version of the [Dormant Mineral Act] apply to claims asserted after 2006 alleging that the rights to oil, gas, and other minerals automatically vested in the surface land holder prior to the 2006 amendments as a result of abandonment?
AND
2. Is the payment of a delay rental during the primary term of an oil and gas lease a title transaction and “savings event” under the [Dormant Mineral Act]?
{¶ 2} For the following reasons, we conclude that the 2006 version of the Dormant Mineral Act, which is codified at R.C. 5301.56, applies to all claims asserted after June 30, 2006, and that a payment of delay rental is neither a title transaction nor a saving event.
Facts and Procedural History

Transfers of the Surface Estate

{¶ 3} In July 1959, the North American Coal Corporation conveyed the surface rights to 164.5 acres of land in Harrison County, Ohio, to Orelen H. Corban and Hans D. Corban, reserving to itself all oil, gas, and mineral rights. Orelen quitclaimed his interest in the surface estate to Carol Ann Corban in 1962, and *513 she and her husband conveyed that share of the surface rights to Hans in 1967 by quitclaim deed, making him the sole owner of the surface rights. Hans transferred the property to Gretchen Corban by quitclaim deed in 1980, and she quitclaimed the property to Hans Michael Corban in 1999 through a deed expressly “subject to conditions, restrictions and easements if any, contained in prior instruments of record.”

Transactions Relating to the Mineral Interests

{¶ 4} In January 1974, North American Coal leased its oil and gas rights to the National Petroleum Corporation, and that entity recorded the lease but assigned it to the American Exploration Company, which obtained a drilling permit and assigned the lease in 1978 to C.E. Beck, acting for and on behalf of RSC Energy Corporation. No production of oil or gas resulted, however, and that lease terminated in 1984.
{¶ 5} In January 1984, North American Coal leased the oil and gas rights to Beck, and that lease was recorded. RSC Energy then obtained a drilling permit, and Beck assigned his lease to Carless Resources, Inc., in an assignment recorded in May 1985. No production of oil or gas occurred, however, but North American Coal did receive delay rental payments in 1985, 1986, 1987, and 1988. That lease expired in January 1989.
{¶ 6} Sometime before the lease expired, North American Coal changed its name to the Bellaire Corporation, and Bellaire conveyed the mineral estate to the North American Coal Royalty Company in 2008.
{¶ 7} In January 2009, North American Coal Royalty leased its oil and gas rights to the Mountaineer Natural Gas Company, which recorded the lease and assigned it to Dale Property Services Penn, L.P., in May 2010. That October, it assigned the lease to Ohio Buckeye Energy, L.L.C., reserving a royalty interest that it later assigned to Dale Pennsylvania Royalty, L.P. An oil and gas well was drilled, and it began production in June 2011.
{¶ 8} Ohio Buckeye Energy transferred a portion of its interest in the lease to Larchmont Resources, L.L.C., in October 2011 and another part of the interest to CHK Utica, L.L.C., the next month. In December 2011, Ohio Buckeye Energy merged with Chesapeake Exploration, L.L.C., which transferred part of the remaining interest to Total E & P USA, Inc.

Procedural History

{¶ 9} In 2013, Hans Michael Corban filed this action in the Harrison County Common Pleas Court against North American Coal Royalty, CHK Utica, Chesapeake Exploration, and Total E & P USA, seeking to quiet title to the oil and gas rights under his surface lands and requesting a declaratory judgment, a perma *514 nent injunction, and compensation for conversion. The defending parties removed the matter to federal court on the basis of diversity jurisdiction and counterclaimed for a declaratory judgment and to quiet title in their favor. Corban amended the complaint to add Dale Pennsylvania Royalty and Larchmont Resources as parties and to bring a claim for unjust enrichment.
{¶ 10} The parties moved for summary judgment; the district court concluded that its ruling on those motions required a clarification of two areas of Ohio law: (1) whether the 1989 or the 2006 version of R.C. 5301.56, the Dormant Mineral Act, should be applied to a quiet title action filed after 2006 that asserts that the rights to minerals vested in the surface owner as a result of abandonment prior to 2006 and (2) whether the payment of delay rental during the term of an oil and gas lease constituted a title transaction. The district court certified these questions to our court, and we agreed to answer them. Corban v. Chesapeake Exploration, L.L.C., 139 Ohio St.3d 1482, 2014-Ohio-3195, 12 N.E.3d 1228.
Positions of the Parties
{¶ 11} Corban contends that the 1989 version of R.C. 5301.56 is self-executing because nothing in the statute required any affirmative action or judicial confirmation establishing that the mineral interest had been deemed abandoned and vested in the owner of the surface estate and the legislature intended the statute to encourage development by extinguishing unused mineral interests. He notes that although the General Assembly largely adopted the Uniform Dormant Mineral Interests Act in enacting R.C. 5301.56 in 1989, it rejected the uniform act’s requirement that the claimant file an action to terminate the dormant mineral interest. Corban notes that the United States Supreme Court has upheld statutes that automatically extinguish mineral interests without advance notice to the owner against various constitutional challenges, and because the 1989 version of R.C. 5301.56 was self-executing and afforded him a vested right in the minerals under his land, he contends, the General Assembly cannot retroactively extinguish that right. He concludes that because the surface and mineral estates vested in him prior to the 2006 amendment to R.C. 5301.56, the amendment does not apply to him.
{¶ 12} Regarding the second certified question, Corban urges us to hold that a delay rental payment is not a “title transaction” as defined by R.C. 5301.47(F). He maintains that an oil and gas lease is not a title transaction, because it grants a license to prospect for minerals but does not transfer any interest in real property and cannot affect an interest in land, and therefore an action taken by a lessee to extend the life of that lease by making delay rental payments is not itself a title transaction. He also notes that the 117th General Assembly rejected language in the Uniform Dormant Mineral Interests Act and in the 1989 act as introduced in the legislature that would have expressly provided that an oil and *515 gas lease is a saving event. But even if the expiration of a lease or a delay rental payment were a title transaction, he explains, neither suffices to preserve the mineral interest if not recorded.
{¶ 13} In separately filed briefs, North American Coal Royalty and Chesapeake Exploration, CHK Utica, Dale Pennsylvania, Larchmont Resources, and Total E & P USA assert that the 1989 law was not self-executing, because that statute deemed dormant mineral interests abandoned and vested in the surface owner without expressly extinguishing them or declaring them null and void, and the legislature therefore intended the surface owner to take legal action to obtain ownership of the mineral interest. These parties note that the General Assembly codified the 1989 law as a supplement to the Marketable Title Act, R.C. 5301.47 et seq., which was intended to simplify and facilitate land title transactions by allowing reliance on the record chain of title. But automatic vesting, they note, would occur outside the chain of title and would be in derogation of the common law presumption against a forfeiture. They claim that because Corban took no action to obtain record title to the mineral interest, North American Coal Royalty remained the record title holder, and after June 30, 2006, Corban was required to use the procedures enacted by the 2006 amendment to R.C. 5301.56 to perfect his claim to the mineral estate. And applying the 2006 amendment to his claim does not retroactively extinguish a vested right but rather provides new procedures to perfect that right.
{¶ 14} Further, these parties contend that the dates and amounts of any necessary delay rental payments are set forth in the recorded oil and gas lease and that recording the lease put the world on notice of its terms and gave a title searcher all the information needed to determine whether the payment of delay rentals occurred to extend the lease. In addition, they maintain that a payment of delay rental prevents ownership of oil and gas from reverting to the lessor and therefore is a title transaction because it affects title to the oil and gas and provides notice that the mineral estate holder has not abandoned the mineral rights.
Dormant Mineral Interests
{¶ 15} At common law, mineral rights severed from the surface estate were not subject to abandonment or termination for the failure to produce oil or gas or to extract other minerals. 1A Summers, The Law of Oil and Gas, Section 8.4, at 139 (3d Ed.2004). Abandonment of an interest in real property required proof of the owner’s intent to abandon it, and it therefore could not be presumed from mere nonuse. Gill v. Fletcher, 74 Ohio St. 295, 305, 78 N.E. 433 (1906); Kiser v. Logan Cty. Bd. of Commrs., 85 Ohio St. 129, 131, 97 N.E. 52 (1911); W. Park Shopping Ctr., Inc. v. Masheter, 6 Ohio St.2d 142, 144, 216 N.E.2d 761 (1966); Beer v. Griffith, 61 Ohio St.2d 119, 121, 399 N.E.2d 1227 (1980).
*516 {¶ 16} Over time, mineral rights were fractionalized through devise, descent, and conveyance, and parties seeking to develop a mineral interest often had difficulty identifying and locating its owners. See generally Dodd v. Croskey, 143 Ohio St.3d 293, 2015-Ohio-2362, 37 N.E.3d 147, ¶ 7; Van Slooten v. Larsen, 410 Mich. 21, 45-46, 299 N.W.2d 704 (1980); 1A Summers, The Law of Oil and Gas, Section 8.4, at 139-140.

The Marketable Title Act

{¶ 17} The General Assembly enacted the Marketable Title Act, R.C. 5301.47 et seq., in 1961, Am.H.B. No. 81, 129 Ohio Laws 1040, to extinguish interests and claims in land that existed prior to the root of title, with “the legislative purpose of simplifying and facilitating land title transactions by allowing persons to rely on a record chain of title.” R.C. 5301.55. This legislation provides that marketable record title—an unbroken chain of title to an interest in land for 40 years or more, R.C. 5301.48—“shall be held by its owner and shall be taken by any person dealing with the land free and clear of all interests, claims, or charges whatsoever, the existence of which depends upon any act, transaction, event, or omission that occurred prior to the effective date of the root of title.” R.C. 5301.50. Marketable record title therefore “operates to extinguish” all other prior interests, R.C. 5301.47(A), which “are hereby declared to be null and void,” R.C. 5301.50.
{¶ 18} When initially enacted, the Marketable Title Act did not “bar or extinguish any right, title, estate, or interest in and to minerals, and any mining or other rights appurtenant thereto or exercisable in connection therewith.” Former R.C. 5301.53(E), 129 Ohio Laws at 1046. However, the General Assembly amended former R.C. 5301.53 and former R.C. 5301.56 in 1973 “to enable property owners to clear their titles of disused mineral interests.” Am.S.B. No. 267, 135 Ohio Laws, Part I, 942-943. Thus, the Marketable Title Act extinguished oil and gas rights by operation of law after 40 years from the effective date of the root of title unless a saving event preserving the interest appeared in the record chain of title—i.e., the interest was specifically identified in the muniments of title in a subsequent title transaction, the holder recorded a notice claiming the interest, or the interest “[arose] out of a title transaction which has been recorded subsequent to the effective date of the root of title.” R.C. 5301.48 and 5301.49.

The 1989 Dormant Mineral Act

{¶ 19} The General Assembly again amended the Marketable Title Act in 1989 when it enacted the Dormant Mineral Act, Sub.S.B. No. 223, 142 Ohio Laws, Part I, 981, 985-988 (“S.B. 223”), “to provide a method for the termination of dormant mineral interests and the vesting of their title in surface owners, in the absence of *517 certain occurrences within the preceding 20 years.” 142 Ohio Laws, Part I, at 981.
{¶ 20} The 1989 law, codified in former R.C. 5301.56, stated: “Any mineral interest held by any person, other than the owner of the surface of the lands subject to the interest, shall be deemed abandoned and vested in the owner of the surface,” unless (a) the mineral interest was related to coal, (b) the interest was held by the United States, the state of Ohio, or another political body described in the statute, or (c) one or more of the following saving events had occurred within the preceding 20 years:
(i) The mineral interest has been the subject of a title transaction that has been filed or recorded in the office of the county recorder of the county in which the lands are located;
(ii) There has been actual production or withdrawal of minerals by the holder from the lands, from lands covered by a lease to which the mineral interest is subject, or, in the case of oil or gas, from lands pooled, unitized, or included in unit operations, under sections 1509.26 to 1509.28 of the Revised Code, in which the mineral interest is participating, provided that the instrument or order creating or providing for the pooling or unitization of oil or gas interests has been filed or recorded in the office of the county recorder of the county in which the lands that are subject to the pooling or unitization are located;
(in) The mineral interest has been used in underground gas storage operations by the holder;
(iv) A drilling or mining permit has been issued to the holder, provided that an affidavit that states the name of the permit holder, the permit number, the type of permit, and a legal description of the lands affected by the permit has been filed or recorded, in accordance with section 5301.252 of the Revised Code, in the office of the county recorder of the county in which the lands are located;
(v) A claim to preserve the interest has been filed in accordance with division (C) of this section;
(vi) In the case of a separated mineral interest, a separately listed tax parcel number has been created for the mineral interest in the county auditor’s tax list and the county treasurer’s duplicate tax list in the county in which the lands are located.
Former R.C. 5301.56(B)(1), S.B. 223, 142 Ohio Laws, Part I, at 985, 986-987.
{¶ 21} Notably, in contrast to R.C. 5301.47(A) and 5301.50 of the Marketable Title Act, the 1989 law did not use the word “extinguish,” nor did it declare *518 dormant mineral interests “null and void.” Rather, it provided that dormant mineral interests “shall be deemed abandoned and vested in the owner of the surface.” The word “deem” means “[t]o treat (something) as if (1) it were really something else, or (2) it has qualities that it does not have.” Black’s Law Dictionary 504 (10th Ed.2014).
{¶ 22} As the Sixth Circuit Court of Appeals has explained, “[e]ourts construing the meaning of the word ‘deemed’ when used in a statute have been nearly unanimous in concluding that a conclusive presumption is created.” Mun. Resale Serv. Customers v. Fed. Energy Regulatory Comm., 43 F.3d 1046, 1053 (6th Cir.1995); see, e.g., Rowe v. New Hampshire Motor Transport Assn., 552 U.S. 364, 372, 128 S.Ct. 989, 169 L.Ed.2d 933 (2008) (statute’s “ ‘deemed to know” provision * * * creates a conclusive presumption of carrier knowledge”); Ohio Power Co. v. Fed. Energy Regulatory Comm., 954 F.2d 779, 783 (D.C.Cir.1992) (word “deemed” in regulation establishes conclusive presumption); Butts v. Bysiewicz, 298 Conn. 665, 684, 5 A.3d 932 (2010) (“it is apparent that this term [‘deem’] can indicate a conclusive presumption”); Hutchinson Technology, Inc. v. Commr. of Revenue, 698 N.W.2d 1, 13 (Minn.2005) (“ ‘in our statutes the word “deemed” appears to be treated as creating a conclusive presumption’ ”), quoting First Natl. Bank of Mankato v. Wilson, 234 Minn. 160, 164, 47 N.W.2d 764 (1951); McCuiston v. Addressograph-Multigraph Corp., 308 N.C. 665, 669, 303 S.E.2d 795 (1983), fn. 3 (“the phrase ‘shall be deemed incapable of producing occupational loss of hearing’ creates a conclusive presumption”); Gulf Oil Corp. v. Heath, 255 Ark. 604, 609, 501 S.W.2d 787 (1973) (interpreting the word “deemed” as creating conclusive presumption); State ex rel. Morrison v. Thomas, 80 Ariz. 327, 333, 297 P.2d 624 (1956) (same).
{¶ 23} In State ex rel. Walker v. Clark, 144 Ohio St. 305, 311, 58 N.E.2d 773 (1944), we noted that “[a] conclusive presumption may be defined as an inference which the law makes so peremptory that it may not be overcome by any contrary proof, however strong.” Proof of the basic fact is, in effect, conclusive evidence establishing the presumed fact. A presumption, whether mandatory or permissive, is therefore an evidentiary device—“a staple of our adversary system of factfinding.” Cty. Court of Ulster Cty., New York v. Allen, 442 U.S. 140, 156, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979).
{¶ 24} The Supreme Court of Utah has recently explained that a legislature’s “decision to make a presumption conclusive ‘rests upon grounds of expediency or policy so compelling in character as to override the generally fundamental requirement of our system of law that questions of fact must be resolved according to the proof.’ ” Davis v. Provo City Corp., 2008 UT 59, 193 P.3d 86, ¶ 22, quoting United States v. Provident Trust Co., 291 U.S. 272, 281-282, 54 S.Ct. 389, 78 L.Ed. 793 (1934). Accordingly, in civil litigation, a presumption may *519 implement a legislative policy to make a cause of action easier (or harder) to bring by providing a means to resolve cases in which the dispositive evidence is difficult or impossible to find. 2 McCormick, Evidence, Section 343, at 681-682 (7th Ed.Broun 2013); Mueller & Kirkpatrick, Evidence, Section 3.5, at 138 (1995).
{¶ 25} In enacting the 1989 law, the General Assembly created a conclusive presumption by establishing that a mineral rights holder had abandoned a severed mineral interest if the 20 year statutory period passed without a saving event. The statute remedied the difficulties faced by a surface owner seeking to quiet title to a dormant mineral interest, an action that requires proof that the mineral rights holder—who may not be locatable or identifiable from land records—had abandoned and relinquished that interest. At common law, such an action would have failed absent proof of the property owner’s subjective intent. See Beer, 61 Ohio St.2d at 121, 399 N.E.2d 1227. Thus, by providing a conclusive presumption that the mineral interest had been abandoned in favor of the surface owner if the holder failed to take timely action to preserve it, the legislature provided an effective method of terminating abandoned mineral rights through a quiet title action.
{¶ 26} But because the conclusive presumption of abandonment was only an evidentiary device that applied to litigation seeking to quiet title to a dormant mineral interest, the Dormant Mineral Act does not automatically transfer the interest from the mineral rights holder to the surface owner by operation of law.
{¶ 27} In enacting the 1989 law, the General Assembly sought to help clear title to dormant mineral interests and to encourage the development of Ohio’s mineral resources by allowing parties to rely on a record chain of title to them. See R.C. 5301.55. It becomes apparent from analyzing the sequential legislation on this topic that the legislature did not intend title to dormant mineral interests to pass automatically and outside the record chain of title.
{¶ 28} In accord with this analysis, we conclude that the 1989 law was not self-executing and did not automatically transfer ownership of dormant mineral rights by operation of law. Rather, a surface holder seeking to merge those rights with the surface estate under the 1989 law was required to commence a quiet title action seeking a decree that the dormant mineral interest was deemed abandoned.

The 2006 Amendment to the Dormant Mineral Act

{¶29} The 2006 amendment to R.C. 5301.56(B) provides that a dormant mineral interest “shall be deemed abandoned and vested in the owner of the surface of the lands subject to the interest if the requirements established in division (E) of this section are satisfied.” 2006 Sub.H.B. No. 288 (“H.B. 288”).
*520 {¶ 30} R.C. 5301.56(E) directs the surface holder to give advance notice to the mineral rights holder, allowing it an opportunity to preserve its mineral rights from being deemed abandoned and merged with the surface estate. R.C. 5301.56(E), (F), and (G). If neither a claim to preserve the interest nor an affidavit proving that a saving event occurred within the preceding 20 years is timely recorded, then the surface holder may record a notice that the mineral interest has been abandoned, and “the mineral interest shall vest in the owner of the surface of the lands formerly subject to the interest, and the record of the mineral interest shall cease to be notice to the public of the existence of the mineral interest or of any rights under it.” R.C. 5301.56(H). This statute therefore operates to establish the surface owner’s marketable record title in the mineral estate.
{¶ 31} Dormant mineral interests did not automatically pass by operation of law to the surface owner pursuant to the 1989 law. Thus, as of June 30, 2006, any surface holder seeking to claim dormant mineral rights and merge them with the surface estate is required to follow the statutory notice and recording procedures enacted in 2006 by H.B. 288. These procedures govern the manner by which mineral rights are deemed abandoned and vested in the surface holder and apply equally to claims that the mineral interests were abandoned prior to June 30, 2006.
{¶ 32} Applying R.C. 5301.56 as amended by H.B. 288 to claims filed after its effective date does not impair vested rights in violation of the Retroactivity Clause contained in Article II, Section 28, of the Ohio Constitution. Determining whether a law violates the Retroactivity Clause involves a two-step test:
[W]e must first “determine whether the General Assembly expressly intended the statute to apply retroactively.” [Bielat v. Bielat, 87 Ohio St.3d 350] at 353, 721 N.E.2d 28 [2000]. If so, we must determine whether “the statute is substantive, rendering it unconstitutionally retroactive, as opposed to merely remedial.” (Emphasis sic.) Id. A substantive statute is one that “impairs vested rights, affects an accrued substantive right, or imposes new or additional burdens, duties, obligations, or liabilities as to a past transaction.” Id. at 354, 721 N.E.2d 28; Van Fossen v. Babcock & Wilcox Co. (1988), 36 Ohio St.3d 100, 106-107, 522 N.E.2d 489.
Longbottom v. Mercy Hosp. Clermont, 137 Ohio St.3d 103, 2013-Ohio-4068, 998 N.E.2d 419, ¶ 22. A statute that applies retroactively and that is substantive violates Article II, Section 28 of the Ohio Constitution. Id.
*521 {¶ 33} Here, H.B. 228 is not expressly retrospective, and it applies prospectively to all claims that mineral rights have been abandoned that are asserted after its effective date.
{¶ 34} We recognized in Longbottom that the Retroactivity Clause bars statutes that act prospectively to extinguish preexisting legal rights, but “it does not prohibit legislation that ‘merely affect[s] “the methods and procedure by which rights are recognized) protected and enforced, [and] not * * * the rights themselves.” (Emphasis added.)’ ” Id. at ¶ 25, quoting Bielat at 354, 721 N.E.2d 28, quoting Weil v. Taxicabs of Cincinnati, Inc., 139 Ohio St. 198, 205, 39 N.E.2d 148 (1942). Longbottom involved a statutory amendment that modified the method of calculating prejudgment interest, changing the rate of interest and the date from which it accrued and precluding recovery of prejudgment interest on future damages. We concluded that the legislation did not violate the Retroactivity Clause: “Because the amended statute does not eliminate the right to prejudgment interest but only modifies the remedy available, it applies to causes of action accruing before but filed on or after June 2, 2004, the effective date of the statute.” Id. at ¶ 26.
{¶ 35} Similarly, here, the General Assembly has not divested the surface holder of a right to abandoned mineral interests that accrued prior to the effective date of H.B. 288, but rather, it modified only the method and procedure by which the right is recognized and protected. As this court has recognized, evidentiary rules (such as the conclusive presumption established by the 1989 law) are procedural in nature, and therefore, changing them does not alter a vested substantive right. See Ackison v. Anchor Packing Co., 120 Ohio St.3d 228, 2008-Ohio-5243, 897 N.E.2d 1118, ¶ 29. And notably, the legislature has merely provided a method for the surface holder to obtain marketable record title to an abandoned mineral interest without having to resort to litigation to have that interest declared abandoned. Accordingly, applying the notice and recording procedures enacted by H.B. 288 to surface owners whose claims to abandoned mineral interests are asserted after June 30, 2006, does not violate the Retroac-tivity Clause.

Delay Rental Payments

{¶ 36} Payment of delay rental is neither a title transaction nor a saving event for purposes of the Dormant Mineral Act.
{¶ 37} Delay rental “represents] sums paid by the lessee to the lessor on an annual, quarterly or other basis for the privilege of postponing drilling or other operations under [an oil and gas] lease.” Davis v. Hardman, 148 W.Va. 82, 89, 133 S.E.2d 77 (1963). It is “the consideration paid by the lessee to the lessor in return for permission to delay drilling or production.” Antelope Prod. Co. v. Shriners Hosp. for Crippled Children, 236 Neb. 804, 806, 464 N.W.2d 159 (1991).
*522 {¶ 38} The payment of delay rental is not a saving event under either the 1989 Dormant Mineral Act or the 2006 amendment to it, because it is not “a title transaction that has been filed or recorded in the office of the county recorder of the county in which the lands are located” as required by the statute. A record of a delay rental payment is not included in the sets of records, such as deeds, mortgages, and leases, that the county recorder is required to keep pursuant to R.C. 317.08. Had the General Assembly intended the payment of delay rental to be a title transaction, it could have required records of delay rental payments to be filed with the county recorder. It did not do so. Additionally, a “title transaction” is a transaction that affects title to any interest in land. R.C. 5301.47(F). There is no basis to support a conclusion that a delay rental payment alone affects title separate and apart from the oil and gas lease.
{¶ 39} Because a delay rental payment does not affect title to any interest in land, occurs outside the record chain of title, and is not filed or recorded in the office of the county recorder, it is neither a title transaction nor a saving event.
Conclusion
{¶ 40} The 1989 Dormant Mineral Act was not self-executing and did not automatically transfer ownership of dormant mineral rights by operation of law; rather, the surface holder was required to bring a quiet title action seeking a decree that the mineral rights had been abandoned in order to merge those rights into the surface estate.
{1141} The 2006 amendment to the Dormant Mineral Act applies to claims asserted after its effective date and specifies the procedure that a surface holder is required to follow in order to have dormant mineral rights deemed abandoned and merged with the surface estate.
{¶ 42} The payment of delay rental is not a saving event. The Dormant Mineral Act requires that a title transaction affect title to any interest in land and be recorded to constitute a saving event. But the Revised Code makes no provision for recording the payment of delay rental with the county recorder, and in this case, it was not recorded. Therefore, the payment of delay rental is not a saving event.
So answered.
O’Connor, C.J., and French, J., concur.
Lanzinger, J., concurs in judgment only.
Kennedy, J., concurs in judgment only as to the first certified question and concurs as to the second certified question, with an opinion.
Pfeifer, J., dissents as to the first certified question and concurs as to the second certified question, with an opinion joined by O’Neill, J.