[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *West v. Bode*, Slip Opinion No. 2020-Ohio-5473.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2020-OHIO-5473

WEST ET AL., APPELLEES, *v.* BODE ET AL., APPELLANTS.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *West v. Bode*, Slip Opinion No. 2020-Ohio-5473.]

*Marketable Title Act—Dormant Mineral Act—No irreconcilable difference between the two acts—Judgment affirmed.*

(No. 2019-1494—Submitted July 8, 2020—Decided December 2, 2020.)

APPEAL from the Court of Appeals for Monroe County, No. 18 MO 0017, 2019-Ohio-4092.

_____

FRENCH, J.

{¶ 1} This appeal concerns the interplay between the Ohio Marketable Title Act, R.C. 5301.47 et seq., and the subsequently enacted Ohio Dormant Mineral Act, R.C. 5301.56, which is itself part of the Marketable Title Act. We specifically consider the continued viability of the Marketable Title Act as it relates to interests in oil and gas that have been severed from the interests in surface property. Appellants, John L. Christman, Katherine Haselberger, and Charlotte McCoy, as

well as amici curiae Ascent Resources-Utica, L.L.C., and Gulfport Energy Corporation, urge this court to hold that the Dormant Mineral Act supersedes and controls over the original Marketable Title Act due to a conflict between the two acts.

{¶ 2} An express purpose of both the Marketable Title Act and the Dormant Mineral Act is to "simplify[] and facilitat[e] land title transactions by allowing persons to rely on a record chain of title." R.C. 5301.55. The acts operate in different ways to individually achieve that purpose. We acknowledge at the outset, however, the concerns expressed by amici Ascent Resources-Utica, L.L.C., and Gulfport Energy Corporation that *joint* application of the acts to severed oil and gas interests brings about the unintended consequence of complicating determinations of ownership of those interests. But because we discern no irreconcilable conflict between the Dormant Mineral Act and the Marketable Title Act, we must apply them as the General Assembly wrote them—as independent, alternative statutory mechanisms that may be used to reunite severed mineral interests with the surface property subject to those interests.

### Facts and procedural background

{¶ 3} As with most mineral-interest cases, this one presents facts that defy easy recitation.

{¶ 4} In 1902, George L. and Charlotte Parks sold to C.J. Bode and George T. Nalley one-half of the royalty interest in the oil and gas underlying about 66 acres of land in Monroe County (the "severed royalty interest"), as evidenced by a recorded sale of royalty. In 1916, through multiple recorded transactions, the severed royalty interest was transferred to E.J. Wichterman, Clara Thompson, and M.M. Mann.

{¶ 5} George Parks transferred the surface property to Lettie West in 1929 by way of a warranty deed that stated, "The one half royalty is reserved by grantor in aforesaid tracts as sold to C.J. Bode and George T. Nalley." Following Lettie

West's death in 1959, the property was transferred to George E. West by way of a recorded certificate of transfer. The certificate of transfer confirmed that the property was the same as that conveyed in the 1929 deed to Lettie West, but it did not mention the severed royalty interest. In 1996, George E. West and his wife transferred the property—again defined as the same premises that George Parks conveyed to Lettie West in January 1929—to appellee Wayne West, subject to "all * * * reservations of record." In 2002, Wayne West and his wife conveyed a portion of the property to appellee Rusty West, "[s]ubject to all * * * reservations * * * of record."

{¶ 6} In February 2017, appellees Wayne and Rusty West ("the Wests") filed this action in the Monroe County Court of Common Pleas for a declaratory judgment that the Marketable Title Act had extinguished the severed royalty interest and had vested that previously severed interest in the Wests. They named as defendants Bode, Nalley, Thompson, Wichterman, Mann, and Mann's predecessor in interest, A.D. McVey, as well as their unknown heirs, devisees, executors, administrators, relicts, next of kin, and assigns. Service by publication was made on defendants, none of whom filed an answer.

{¶ 7} Appellants filed a motion to intervene and to file a counterclaim, which the trial court granted. Appellants claim they are the owners of a portion of the severed royalty interest. In their counterclaim, they seek a declaration that they are the owners of 1/16 of the royalty interest in oil and gas underlying the subject property, as well as an order quieting their title to that interest. Appellants' claimed interest stems from a 1944 auditor's deed that transferred 1/16 of the royalty interest in oil and gas underlying the subject property to Nova A. Christman. The auditor's deed identified the subject property and its owner, Lettie West, as well as the recorded 1902 sale of royalty interest from George L. and Charlotte Parks. Nova and Dollie W. Christman recorded a notice of claim of their interest in 1977, citing R.C. 5301.51 and 5301.52—provisions of the Marketable Title Act that provide for

preservation by notice. A certificate of transfer recorded with the Monroe County Recorder in 2007 establishes that Nova A. Christman's mineral interest had been conveyed to appellants upon his death.

{¶ 8} Appellants filed a motion for summary judgment, in which they argued that the Wests had failed to state a valid claim under the Marketable Title Act because the more specific provisions of the Dormant Mineral Act supersede the general provisions of the Marketable Title Act. The Wests responded by filing their own motion for summary judgment. They argued that the severed royalty interest had been extinguished by operation of law pursuant to the Marketable Title Act, in part because neither the Wests' 1959 root of title (that is, the transfer from Lettie West to George West) nor any recorded document transferring the surface property during the following 40 years mentioned the severed royalty interest.

{¶ 9} The trial court granted appellants' motion for summary judgment and declared them the owners of a 1/16 royalty interest in oil and gas underlying the subject property. It held that the Dormant Mineral Act irreconcilably conflicts with the general provisions of the Marketable Title Act and that the more specific Dormant Mineral Act controls.

{¶ 10} The Seventh District Court of Appeals reversed the trial court's judgment and remanded the case for the trial court to adjudicate the Wests' claim under the Marketable Title Act. 2019-Ohio-4092, 145 N.E.3d 1190, ¶ 63. It held that the Marketable Title Act and the Dormant Mineral Act "are co-extensive alternatives whose applicability in a particular case depends on the time passed and the nature of the items existing in the pertinent records." *Id.* at ¶ 47.

{¶ 11} This court accepted a discretionary appeal to decide whether the Dormant Mineral Act supersedes the Marketable Title Act with respect to severed mineral interests. *See* 157 Ohio St.3d 1535, 2020-Ohio-122, 137 N.E.3d 1196.

*Analysis*

*R.C. 1.51*

{¶ 12} The heart of appellants' position—that the Marketable Title Act does not apply to severed interests in oil and gas, because the more specific Dormant Mineral Act supersedes it—arises from R.C. 1.51, which sets out the familiar specific-over-general rule of statutory construction. R.C. 1.51 states:

> If a general provision conflicts with a special or local provision, they shall be construed, if possible, so that effect is given to both. If the conflict between the provisions is irreconcilable, the special or local provision prevails as an exception to the general provision, unless the general provision is the later adoption and the manifest intent is that the general provision prevail.

{¶ 13} In other words, courts should construe conflicting statutes in a way that gives effect to both. *Id.* A specific statutory provision will prevail over a general one only when the provisions irreconcilably conflict. *Gahanna-Jefferson Local School Dist. Bd. of Edn. v. Zaino*, 93 Ohio St.3d 231, 234, 754 N.E.2d 789 (2001), citing *United Tel. Co. of Ohio v. Limbach*, 71 Ohio St.3d 369, 372, 643 N.E.2d 1129 (1994).

{¶ 14} The validity of appellants' argument depends, then, on the existence of an irreconcilable conflict between the Marketable Title Act and the Dormant Mineral Act. We examine each in turn.

*The Marketable Title Act*

{¶ 15} "The General Assembly enacted the Marketable Title Act, R.C. 5301.47 et seq., in 1961, Am.H.B. No. 81, 129 Ohio Laws 1040, to extinguish interests and claims in land that existed prior to the root of title, with 'the legislative purpose of simplifying and facilitating land title transactions by allowing persons

to rely on a record chain of title.' " *Corban v. Chesapeake Exploration, L.L.C.*, 149 Ohio St.3d 512, 2016-Ohio-5796, 76 N.E.3d 1089, ¶ 17, quoting R.C. 5301.55. The Marketable Title Act provides that a person who has an unbroken chain of title of record to any interest in land for at least 40 years has a "marketable record title" to the interest. R.C. 5301.48. Except as stated in R.C. 5301.49, a marketable record title "operates to extinguish" all interests and claims that existed prior to the effective date of the root of title, R.C. 5301.47(A), and those preexisting interests are "declared to be null and void," R.C. 5301.50. The Marketable Title Act extinguishes property interests by operation of law after 40 years from the effective date of the root of title unless a saving event has occurred. *Corban* at ¶ 18 (lead opinion) and ¶ 75 (Kennedy, J., concurring). An interest that has been extinguished by operation of the Marketable Title Act cannot be revived. *See* R.C. 5301.49(D).

{¶ 16} R.C. 5301.49 sets out circumstances in which a marketable record title will remain subject to interests that existed prior to the root of title. Those exceptions " 'serve as a shield to protect' " the excepted interests from extinguishment. *Spring Lakes, Ltd. v. O.F.M. Co.*, 12 Ohio St.3d 333, 335, 467 N.E.2d 537 (1984), quoting *Heath v. Turner*, 309 N.C. 483, 493, 308 S.E.2d 244 (1983). We have referred to those exceptions as "saving event[s]." *Corban* at ¶ 18. In part, R.C. 5301.49 provides that a marketable record title remains subject to an interest that predates the effective date of the root of title when (1) the preexisting interest is specifically identified in the muniments that form the record chain of title, (2) the holder of the preexisting interest has recorded a notice claiming the interest, in accordance with R.C. 5301.51, or (3) the preexisting interest arises out of a title transaction that was recorded subsequent to the effective date of the root of title. R.C. 5301.49(A), (B), and (D).

{¶ 17} As originally enacted in 1961, the Marketable Title Act did not apply to mineral interests. Former R.C. 5301.53(E), 129 Ohio Laws at 1046. The General Assembly amended the act in 1973, however, " 'to enable property owners to clear

their titles of disused mineral interests.' " *Corban* at ¶ 18, quoting Am.S.B. No. 267, 135 Ohio Laws, Part I, 942-943. That amendment included a grace period, through the end of 1976, that afforded mineral-interest holders more than three years in which to preserve their interests and avoid extinguishment of those interests by the Marketable Title Act. Former R.C. 5301.56, Am.S.B. No. 267, 135 Ohio Laws, Part I, at 943. Thereafter, "the Marketable Title Act extinguished oil and gas rights by operation of law after 40 years from the effective date of the root of title" unless one of the saving events set out in R.C. 5301.49 applied. *Corban* at ¶ 18.

{¶ 18} This court first addressed application of the Marketable Title Act to a severed mineral interest in *Heifner v. Bradford*, 4 Ohio St.3d 49, 51, 446 N.E.2d 440 (1983). *Heifner* involved competing claims to the mineral rights underlying real property owned by William H. and Shirley S. Waters. The Waterses argued that the Marketable Title Act had previously extinguished the severed mineral interest by operation of law because neither their root of title—a 1936 deed—nor any subsequent document in the surface estate's chain of title mentioned a preexisting mineral reservation. *Id.* at 49-51. Affidavits of transfer of the reserved mineral rights were recorded in 1957 as part of a chain of title independent from that of the surface estate. *Id.* at 51.

{¶ 19} The Waterses held an unbroken chain of record title to the surface estate for more than 40 years, which extinguished prior claims and interests, except as provided in R.C. 5301.49. *Id.* The Waterses argued that the 1957 affidavits of transfer did not constitute "title transactions" under R.C. 5301.49(D) that would preserve the severed mineral interest because they did not appear within the same chain of title as that under which they were claiming marketable record title. *Id.*

{¶ 20} For guidance in evaluating the Waterses' argument, this court looked to the Model Marketable Title Act, upon which the General Assembly based the Ohio act. We cited a comment in the model act, which stated that a conveyance

recorded subsequent to the effective date of the root of title preserves a preexisting interest " 'both where there are claims under a single chain of title and where there are *two or more independent chains of title*.' " (Emphasis added in *Heifner*.) *Id.* at 52, quoting Simes & Taylor, Model Title Standards 32 (1960). In line with the model act, this court rejected the Waterses' argument and instead held that a marketable record title remains "subject to an interest arising out of a 'title transaction' under R.C. 5301.49(D) which may be part of an independent chain of title" from the surface property. *Id.* at 52-53. Because the recorded 1957 transfer of the mineral rights was a title transaction under R.C. 5301.49(D), the Marketable Title Act did not extinguish the mineral interest. *Id.* at 53.

*The Dormant Mineral Act*

{¶ 21} The General Assembly enacted the Dormant Mineral Act as a component of the Marketable Title Act in 1989 " 'to provide a method for the termination of dormant mineral interests and the vesting of their title in surface owners, in the absence of certain occurrences within the preceding 20 years.' " *Corban*, 149 Ohio St.3d 512, 2016-Ohio-5796, 76 N.E.3d 1089, at ¶ 19, quoting Sub.S.B. No. 223, 142 Ohio Laws, Part I, 981. The Dormant Mineral Act provided a mechanism to facilitate the reunification of abandoned mineral interests with surface interests in order "to clear title and promote the use of the mineral rights for development and production." *Chesapeake Exploration, L.L.C. v. Buell*, 144 Ohio St.3d 490, 2015-Ohio-4551, 45 N.E.3d 185, ¶ 25.

{¶ 22} The 1989 Dormant Mineral Act stated:

> "Any mineral interest held by any person, other than the owner of the surface of the lands subject to the interest, shall be deemed abandoned and vested in the owner of the surface," unless (a) the mineral interest was related to coal, (b) the interest was held by the United States, the state of Ohio, or another political body

8

described in the statute, or (c) one or more of the * * * saving events [listed in former R.C. 5301.56(B)(1)(c)] had occurred within the preceding 20 years.

{¶ 23} *Corban* at ¶ 20, quoting former R.C. 5301.56(B)(1), Sub.S.B. No. 223, 142 Ohio Laws, Part I, at 986. When it enacted the Dormant Mineral Act, the General Assembly did not amend the general provisions of the Marketable Title Act to once again exclude interests in oil and gas. Nor did it include language to indicate that the Dormant Mineral Act was the exclusive remedy for clearing title to severed mineral interests.

{¶ 24} The General Assembly amended the Dormant Mineral Act in 2006, in part to require a surface owner to initiate a notice procedure, as set out in R.C. 5301.56(E)(1), before a mineral interest could be deemed abandoned and vested in the surface owner. Sub.H.B. No. 288, 151 Ohio Laws, Part III, 5960, 5966. Unlike the 1989 version of the act, however, the 2006 Dormant Mineral Act afforded a mineral-interest holder the opportunity to preserve that interest, even after the passage of 20 years without a saving event, by filing a notice of preservation within 60 days after the surface owner serves notice of intent to declare the mineral interest abandoned. *Dodd v. Crosky*, 143 Ohio St.3d 293, 2015-Ohio-2362, 37 N.E.3d 147, ¶ 27, 34, citing R.C. 5301.56(H).

{¶ 25} Both as enacted in 1989 and as amended in 2006, the Dormant Mineral Act operates differently than the Marketable Title Act. It does not extinguish interests by operation of law; interests are instead " 'deemed abandoned and vested in the owner of the surface.' " *Corban*, 149 Ohio St.3d 512, 2016-Ohio-5796, 76 N.E.3d 1089, at ¶ 21, quoting former R.C. 5301.56(B)(1), Sub.S.B. No. 223, 142 Ohio Laws, Part I, at 986, and ¶ 29, quoting former R.C. 5301.56(B), Sub.H.B. No. 288, 151 Ohio Laws, Part III, at 5966. Based on the General Assembly's use of the phrase "shall be deemed abandoned," we held that the 1989

Dormant Mineral Act was not self-executing but instead "created a conclusive presumption" of abandonment—an "evidentiary device" that a surface owner may use in a quiet-title action to eliminate a dormant mineral interest. *Id.* at ¶ 25, 26. The 2006 Dormant Mineral Act uses the same operative language and likewise creates a conclusive presumption of abandonment.

{¶ 26} A surface owner who sought to reunite a severed mineral interest with the surface estate under the 1989 Dormant Mineral Act was required to commence a quiet-title action for a decree that the mineral interest was deemed abandoned. *Id.* at ¶ 28. But the 2006 act created an extrajudicial mechanism to effectuate reunification of severed mineral interests. Upon compliance with its terms, which include not only the notice procedures under R.C. 5301.56(E)(1) but also the recording of a notice of abandonment under R.C. 5301.56(E)(2), the 2006 Dormant Mineral Act operates "to establish the surface owner's marketable record title in the mineral estate." *Corban* at ¶ 30. *See also* R.C. 5301.56(H)(2) ("Immediately after the notice of failure to file a mineral interest is recorded, the mineral interest shall vest in the owner of the surface of the lands formerly subject to the interest * * * ").

*There is no irreconcilable conflict between the Marketable Title Act and the*
*Dormant Mineral Act*

{¶ 27} Appellants acknowledge that R.C. 1.51 requires an irreconcilable conflict between specific and general statutes before the specific will prevail as an exception to the general. In support of their assertion of an irreconcilable conflict here, appellants identify several differences between the Dormant Mineral Act and the general provisions of the Marketable Title Act, including that the acts contain different lookback periods, that the Dormant Mineral Act does not automatically extinguish interests, and that the Dormant Mineral Act contains saving events and notice requirements that are not part of the original Marketable Title Act. While differences indisputably exist, they do not demonstrate an irreconcilable conflict.

**{¶ 28}** As we stated in our discussion of the acts individually, the Marketable Title Act and the Dormant Mineral Act operate differently and after different periods of time. The Marketable Title Act extinguishes property interests after 40 years without a saving event, measured from the effective date of the surface owner's root of title; the Dormant Mineral Act provides a mechanism that a surface owner may use to have a severed mineral interest deemed abandoned and vested in the surface owner after a shorter, 20-year period. One commentator has stated:

> In general, a dormant mineral act provides a mechanism, similar to a marketable title act, to erase the ambiguity created by ancient claims, but it does so more aggressively. In other words, ancient claims do not need to be so ancient to be quickly dismissed by the function of a dormant minerals act-if such claims pose a threat to the marketable title of natural resources.

**{¶ 29}** Stewart, When the Shale Gale Hit Ohio: The Failures of the Dormant Mineral Act, Its Heroic Interpretations, and Grave Choices Facing the Supreme Court, 43 Cap.U.L.Rev. 435, 440 (2015). But the fact that the two acts operate differently, toward different ends, does not mean that they are irreconcilably in conflict. Indeed, it suggests the contrary.

**{¶ 30}** Appellants correctly point out that the Dormant Mineral Act includes saving events that are not included as saving events under the Marketable Title Act. But it is neither surprising nor an indication of an irreconcilable conflict that in light of their differing operations, the two acts contain different saving events. The Dormant Mineral Act is concerned with abandonment—a fact that, at common law, would have required proof of the owner's subjective intent. *See Corban*, 149 Ohio St.3d 512, 2016-Ohio-5796, 76 N.E.3d 1089, at ¶ 25, citing *Beer v. Griffith*, 61

Ohio St.2d 119, 121, 399 N.E.2d 1227 (1980). Saving events under the Dormant Mineral Act therefore tend to be relevant to the question of the owner's intent; they include the existence of title transactions, production of minerals, use of the interest for underground gas storage, issuance of a permit with respect to the interest, claims of preservation, and the issuance of a separate tax parcel number for the mineral interest. *See* R.C. 5301.56(B)(3)(a) through (f). Application of the Marketable Title Act, on the other hand, is not concerned with abandonment and therefore does not call into question the owner's subjective intent. Because the acts affect mineral interests differently, it is only reasonable that they contain different saving events, and we may not disregard the General Assembly's policy determinations in support of the statutory differences in the guise of construction. *See Stetter v. R.J. Corman Derailment Servs., L.L.C.*, 125 Ohio St.3d 280, 2010-Ohio-1029, 927 N.E.2d 1092, ¶ 35, quoting *Groch v. Gen. Motors Corp.*, 117 Ohio St.3d 192, 2008-Ohio-546, 883 N.E.2d 377, ¶ 212 (" 'It is not the role of the courts 'to establish legislative policies or to second-guess the General Assembly's policy choices' ").

{¶ 31} Appellants express concern that because of the differences between saving events under the two acts, a mineral-interest holder may succeed in preserving an interest under the Dormant Mineral Act but nevertheless face extinguishment of that interest under the Marketable Title Act. True enough, but as with the other differences between the acts, that possibility is not dispositive. First, a mineral interest extinguished by operation of law pursuant to the Marketable Title Act no longer exists to be saved under the Dormant Mineral Act, and it cannot be revived. R.C. 5301.49(D). Further, even in the hypothetical scenario in which a saving event under the Dormant Mineral Act occurs before the 40-year period under the Marketable Title Act has elapsed, the fact that the interest will not be "deemed abandoned" under the Dormant Mineral Act does not preclude the General Assembly from prescribing "extinguishment" of the interest under the Marketable Title Act.

{¶ 32} There is nothing in the statutory language of either act to preclude a mineral-interest holder from ensuring compliance with both the Marketable Title Act and the Dormant Mineral Act. Each statute sets out simple actions that a holder of a mineral interest may take to perpetually preserve that interest. The differences between the acts do not create any obstacle to giving effect to both, which is what R.C. 1.51 directs us to do.

{¶ 33} Amici curiae Ascent Resources-Utica, L.L.C., and Gulfport Energy Corporation cite *In re Petition to Annex 320 Acres to S. Lebanon*, 64 Ohio St.3d 585, 597 N.E.2d 463 (1992), to argue that a specific statute and a general statute irreconcilably conflict when they provide separate mechanisms or standards. That case involved a challenge to the Warren County Board of County Commissioners' resolution approving a landowner-initiated petition to annex land to the village of South Lebanon. *Id.* at 586, 587.

{¶ 34} Cincinnati Milacron, Inc., which owned property within the area to be annexed, opposed the annexation. *Id.* at 587-588. It sought to challenge the board's resolution under two statutes: R.C. 2506.01 and former R.C. 709.07, Am.S.B. No. 151, 138 Ohio Laws, Part I, 409, 410. R.C. 2506.01 provides for a direct appeal to the court of common pleas of "every final order, adjudication, or decision" of a political subdivision. In an R.C. 2506.01 appeal, the court must consider whether the board's order is "unconstitutional, illegal, arbitrary, capricious, unreasonable, or unsupported by the preponderance of substantial, reliable, and probative evidence." R.C. 2506.04. On the other hand, former R.C. 709.07(A) provided for a petition to the court of common pleas "for an injunction restraining the auditor or clerk from presenting the annexation petition and other papers to the legislative authority." The complaining party in an action under former R.C. 709.07 had to establish "by clear and convincing evidence that the board's decision [was] unreasonable or unlawful or that there was some error in the proceedings." *In re Petition to Annex* at 591, citing former R.C. 709.07(D).

{¶ 35} In determining the applicability of those remedies, this court was "confronted with two statutes which appear[ed] on their face to apply two different remedies in challenging decisions made by boards of county commissioners approving annexations of territory." *Id.* at 594. One issue before the court was "whether the General Assembly provided for two distinct remedies for disappointed parties in landowner-petitioned annexation proceedings." *Id.* at 591. We answered that question in the negative. *Id.* at 597. Of particular concern was the fact that the two prescribed actions involved different standards of review. An appeal under R.C. 2506.01 involved a "virtual *de novo* examination of the record," whereas an action for injunctive relief under former R.C. 709.07 was "highly deferential to the board." *Id.* at 594. This court held that "due to the differing standards of review, * * * R.C. 2506.01 appeals cannot be reconciled with R.C. 709.07 injunction actions as applied to" a board's decision on landowner-initiated annexation petitions. *Id.*

{¶ 36} In contrast to the provisions at issue in *In re Petition to Annex*, the Marketable Title Act and the Dormant Mineral Act do not provide different and conflicting mechanisms to evaluate the same action, even though they may both ultimately affect the continued viability of a severed mineral interest. The acts ask different questions and provide for different results. In light of those differing inquiries and consequences, the fact that joint application of the acts may result in a mineral interest being preserved under one but not under the other does not demonstrate a conflict between the acts.

{¶ 37} In perhaps tacit acknowledgement that there is no irreconcilable conflict between the language of the Marketable Title Act and the Dormant Mineral Act, appellants turn to notions of legislative purpose and argue that the two provisions cannot be harmonized because application of the Marketable Title Act to severed mineral interests would frustrate the legislative intent of the Dormant Mineral Act. Specifically, they argue that application of the Marketable Title Act

to severed mineral interests would be contrary to the legislative intent to promote reliance on record chains of title. Appellants' argument is misplaced.

{¶ 38} The legislative purpose upon which appellants rely—"simplifying and facilitating land title transactions by allowing persons to rely on a record chain of title"—is central to *both* the Marketable Title Act and the Dormant Mineral Act. R.C. 5301.55. According to appellants, the Dormant Mineral Act serves that purpose by providing for recorded notices of preservation and affidavits of abandonment. They argue that extinguishment of mineral interests under the Marketable Title Act, which does not require similar recordings, would frustrate that purpose. But that argument overlooks that the General Assembly drafted the Marketable Title Act to operate that way in service of the very purpose appellants now claim is frustrated.

{¶ 39} Appellants' argument is really a broader, general critique of the Marketable Title Act, rather than a specific critique of its application to severed mineral interests. Extinguishment of all interests—whether in minerals or not—occurs the same way under the Marketable Tile Act and relies heavily, if not exclusively, on the record chain of title. Determination of the act's applicability begins with a review of the record chain of title to determine whether any interest predating the effective date of the root of title is identified there. The General Assembly drafted the Marketable Title Act to provide for extinguishment of old interests by operation of law in service of its purpose to encourage reliance on a record chain of title. We therefore presume that operation of the Marketable Title Act satisfies that goal.

{¶ 40} Our reading of R.C. 5301.49(D) in *Heifner*, 4 Ohio St.3d 49, 446 N.E.2d 440, did give rise to the possibility that a title transaction outside the surface owner's chain of title would leave a marketable record title subject to a mineral interest that predates the effective date of the root of title, but the surviving interest will nevertheless be accessible in the recorded property records. Some

commentators have suggested that *Heifner* was an impetus for the enactment of the Dormant Mineral Act, s*ee* Stewart, *When the Shale Gale Hit Ohio,* 43 Cap.U.L.Rev. at 440, fn. 46, but there is no indication in the statutory language that the General Assembly enacted the Dormant Mineral Act to remedy an inadequacy in the Marketable Title Act's service of its codified legislative purpose. Notably, the General Assembly did not amend the Marketable Title Act in response to *Heifner* to define the subset of title transactions that could constitute a saving event as those appearing within the chain of title upon which record marketable title was based. A more reasonable explanation is that the legislature intended the Dormant Mineral Act to provide surface owners an *additional* mechanism to accomplish reunification of dormant mineral interests with the surface estate in order to promote the use of natural resources when those interests could not be extinguished under the Marketable Title Act.

{¶ 41} Less than two years ago, this court decided a discretionary appeal that involved claims that a severed mineral interest had been both abandoned under the Dormant Mineral Act and extinguished under the Marketable Title Act. *See Blackstone v. Moore*, 155 Ohio St.3d 448, 2018-Ohio-4959, 122 N.E.3d 132. The claim under the Marketable Title Act hinged on R.C. 5301.49(A), which states that marketable record title remains subject to interests that are inherent in the chain of title, " 'provided that a general reference * * * to * * * interests created prior to the root of title shall not be sufficient to preserve them, unless specific identification be made therein of a recorded title transaction which creates such * * * interest.' " *Blackstone* at ¶ 11, quoting the statute. The court of appeals held that reservation language in a 1969 deed that appeared in the surface owner's chain of title preserved the mineral interest under that provision. The issue before this court was the meaning of "specific identification" in R.C. 5301.49(A), as the surface owner argued that the reference in the 1969 deed was not sufficiently specific to preserve the mineral interest. We rejected that argument. But we did not question that

severed mineral interests may be extinguished under the Marketable Title Act, despite the concurrent applicability of the Dormant Mineral Act.

{¶ 42} Justice DeGenaro concurred separately in *Blackstone* to emphasize what she viewed as "the narrow scope" of the holding. *Id.* at ¶ 19 (DeGenaro, J., concurring). She characterized the holding as not "hing[ing] on the nature of the interest" and cautioned against reading the opinion "to implicitly hold that the more general Marketable Title Act continues to apply to mineral interests following the enactment of the Dormant Mineral Act." *Id.* While appellants seize on that concurring opinion to argue that *Blackstone* is irrelevant to the question now before this court, the concurring opinion is not binding precedent. *See, e.g., In re Adoption of Peshek*, 143 Ohio App.3d 839, 843, 759 N.E.2d 411 (2d Dist.2001). Furthermore, we may not ignore that, in *Blackstone*, a majority of this court expressly affirmed a judgment that a severed mineral interest had been preserved under the Marketable Title Act.

*Appellants have not preserved a due-process argument*

{¶ 43} Appellants state in their merit brief that an owner of a severed mineral interest is entitled to due process of law before the owner can be deprived of that interest. They do not, however, develop any specific argument with respect to due process, nor does it appear that they did so in either the trial court or the court of appeals. It is well settled that a party who fails to raise an argument in the court below waives or forfeits the right to raise it here. *Niskanen v. Giant Eagle, Inc.*, 122 Ohio St.3d 486, 2009-Ohio-3626, 912 N.E.2d 595, ¶ 34, citing *State ex rel. Zollner v. Indus. Comm.*, 66 Ohio St.3d 276, 278, 611 N.E.2d 830 (1993). But even if appellants had raised the question below, any suggestion that continued application of the Marketable Title Act to severed mineral interests violates due process is beyond the proposition of law this court accepted for review, and we decline to consider it. *See New Riegel Local School Dist. Bd. of Edn. v. Buehrer Group Architecture & Eng., Inc.*, 157 Ohio St.3d 164, 2019-Ohio-2851, 133 N.E.3d

482, ¶ 32; *Wesolowski v. Broadview Hts. Planning Comm.*, 158 Ohio St.3d 58, 2019-Ohio-3713, 140 N.E.3d 545, ¶ 28.

## *Conclusion*

{¶ 44} Because there is no irreconcilable conflict between the general provisions of the Marketable Title Act as applied to severed mineral interests and the Dormant Mineral Act, both acts retain effect. The Marketable Title Act and the Dormant Mineral Act afford independent procedures, either of which may be used to effect the termination of a severed mineral interest, depending on the circumstances of the case and the time that has elapsed. We therefore affirm the judgment of the Seventh District Court of Appeals, which reversed the Monroe County Court of Common Pleas' entry of summary judgment, and we remand this matter to the trial court for consideration of the Wests' claim under the Marketable Title Act.

Judgment affirmed.

O'CONNOR, C.J., and DEWINE and STEWART, JJ., concur.

KENNEDY, J., dissents, with an opinion joined by DONNELLY, J.

FISCHER, J., dissents.

_____

**KENNEDY, J., dissenting.**

{¶ 45} Because the 1973 amendment to the Marketable Title Act, R.C. 5301.47 et seq., is substantively irreconcilable with subsequent amendments to the statute enacted by the Dormant Mineral Act, R.C. 5301.56, the procedures of the Dormant Mineral Act control in determining whether a severed interest in oil and gas has been reunited with the surface estate. I therefore disagree with the majority's holding that the Marketable Title Act and the Dormant Mineral Act create independent, alternative statutory mechanisms to deprive a mineral-interest holder of private property. For these reasons, I dissent and would reverse the judgment of the Seventh District Court of Appeals.

**The Marketable Title Act**

{¶ 46} The General Assembly enacted the Marketable Title Act in 1961 with "the legislative purpose of simplifying and facilitating land title transactions by allowing persons to rely on a record chain of title." R.C. 5301.55. It sought to accomplish this purpose by providing that marketable record title—an unbroken chain of title to an interest in land for 40 years or more, R.C. 5301.48—"shall be held by its owner and shall be taken by any person dealing with the land free and clear of all interests, claims, or charges whatsoever, the existence of which depends upon any act, transaction, event, or omission that occurred prior to the effective date of the root of title." R.C. 5301.50. The existence of marketable record title "operates to extinguish" all other prior interests, R.C. 5301.47(A), which "are hereby declared to be null and void," R.C. 5301.50.

{¶ 47} The Marketable Title Act also provided that the existence of marketable title did not extinguish a prior interest if a saving event preserving that interest appeared in the record chain of title—i.e., the interest was specifically identified in the muniments of title in a subsequent title transaction, the holder recorded a notice claiming the interest, or the interest "[arose] out of a title transaction which has been recorded subsequent to the effective date of the root of title." R.C. 5301.48 and 5301.49.

{¶ 48} The General Assembly amended the Marketable Title Act in 1973 "to enable property owners to clear their titles of disused mineral interests," excluding coal rights. Am.S.B. No. 267, 135 Ohio Laws, Part I, 942-943. However, the shortcomings of this statutory mechanism to terminate unused mineral interests soon became apparent.

{¶ 49} Our decision in *Heifner v. Bradford,* 4 Ohio St.3d 49, 446 N.E.2d 440 (1983), highlighted how the Marketable Title Act failed to extinguish all dormant severed mineral interests. *Heifner* involved claims to oil and gas arising from two independent chains of title. A 1916 deed transferred the surface estate

while reserving the oil and gas rights. The surface owner transferred the property in 1936 through a deed that did not mention the reservation, which came to exist in a separate chain of title through affidavits of transfer recorded in 1957. The surface owner had unbroken title to the property—including the oil and gas rights—from the 1936 root of title. However, we held that the oil and gas reservation was not extinguished by operation of the Marketable Title Act, because "a 'marketable title,' as defined in R.C. 5301.47(A) and 5301.48, is subject to an interest arising out of a 'title transaction' under R.C. 5301.49(D) which may be part of an independent chain of title." *Id.* at 52-53.

{¶ 50} This court's interpretation of the Marketable Title Act to sustain an oil and gas interest that was created before the root of title but existed outside the surface owner's chain of title "was '[t]he impetus for the creation of the [Dormant Mineral Act],' " R.C. 5301.56. *Corban v. Chesapeake Exploration, L.L.C.*, 149 Ohio St.3d 512, 2016-Ohio-5796, 76 N.E.3d 1089, ¶ 61 (Kennedy, J., concurring in part), quoting *Wendt v. Dickerson,* 5th Dist. Tuscarawas No. 2014 AP 01 0003, 2014-Ohio-4615, ¶ 21. As one commentator has explained, after *Heifner*, "it became obvious that the Ohio Marketable Title Act would not be an effective mechanism for clarifying or terminating title to ancient mineral claims." Stewart, *When the Shale Gale Hit Ohio: The Failures of the Dormant Mineral Act, Its Heroic Interpretations, and Grave Choices Facing the Supreme Court*, 43 Cap.U.L.Rev. 435, 440 (2015), fn. 46.

### The Dormant Mineral Act

{¶ 51} The 1989 version of the Dormant Mineral Act provided that a severed mineral interest was "deemed abandoned and vested in the owner of the surface" if none of the following applied: (1) the mineral interest was in coal or was coal-related, (2) the mineral interest was held by the United States, the state, or any other political body, or (3) a saving event occurred within the statutorily provided

20-year period.  *See* former R.C. 5301.56, Sub.S.B. No. 223, 142 Ohio Laws, Part I, 981, 985-988.

{¶ 52} The saving events provided by the statute were:

(i) The mineral interest has been the subject of a title transaction that has been filed or recorded in the office of the county recorder of the county in which the lands are located;

(ii) There has been actual production or withdrawal of minerals by the holder from the lands, from lands covered by a lease to which the mineral interest is subject, or, in the case of oil or gas, from lands pooled, unitized, or included in unit operations, under sections 1509.26 to 1509.28 of the Revised Code, in which the mineral interest is participating, provided that the instrument or order creating or providing for the pooling or unitization of oil or gas interests has been filed or recorded in the office of the county recorder of the county in which the lands that are subject to the pooling or unitization are located;

(iii) The mineral interest has been used in underground gas storage operations by the holder;

(iv) A drilling or mining permit has been issued to the holder, provided that an affidavit that states the name of the permit holder, the permit number, the type of permit, and a legal description of the lands affected by the permit has been filed or recorded, in accordance with section 5301.252 of the Revised Code, in the office of the county recorder of the county in which the lands are located;

(v) A claim to preserve the interest has been filed in accordance with division (C) of this section;

(vi) In the case of a separated mineral interest, a separately listed tax parcel number has been created for the mineral interest in the county auditor's tax list and the county treasurer's duplicate tax list in the county in which the lands are located.

*Id*. These saving events are now codified at R.C. 5301.56(B)(3).

{¶ 53} "In enacting the 1989 law, the General Assembly sought to help clear title to dormant mineral interests and to encourage the development of Ohio's mineral resources by allowing parties to rely on a record chain of title to them. *See* R.C. 5301.55." *Corban,* 149 Ohio St.3d 512, 2016-Ohio-5796, 76 N.E.3d 1089, at ¶ 27 (lead opinion).

{¶ 54} However, some of the saving events provided in the 1989 statute could occur only outside the chain of title, and a majority of this court concluded in *Corban* that the General Assembly did not intend for the Dormant Mineral Act to be self-executing when it provided for qualifying mineral interests to be "deemed abandoned." *Id*. at ¶ 27-28 (lead opinion); *id*. at ¶ 43 (Kennedy, J., concurring in part). "Because 'deemed' means only that the mineral interest is presumed abandoned, judicial action, typically by way of a quiet-title action, was required by the surface owner for a conclusive determination that the mineral interest was abandoned and vested in the surface owner." *Albanese v. Batman*, 148 Ohio St.3d 85, 2016-Ohio-5814, 68 N.E.3d 800, ¶ 18.

{¶ 55} The General Assembly's use of "abandoned" in the Dormant Mineral Act instead of "extinguished" as in the Marketable Title Act was essential to this conclusion. At common law, a severed mineral interest was not extinguished or terminated by the owner's failure to produce oil and gas, but it could be abandoned upon proof that the owner intended to relinquish it. *See* 1A Summers, *The Law of Oil and Gas,* Section 8.4, at 139 (3d Ed.2004); *Beer v. Griffith,* 61 Ohio St.2d 119, 399 N.E.2d 1227 (1980), paragraph one of the syllabus. The mere lapse

of time without using the property could be probative of that intent but was not by itself sufficient to prove that abandonment occurred. *See Junction RR. Co. v. Ruggles,* 7 Ohio St. 1, 10-11 (1857). "Abandoned" therefore had a specific meaning at common law, and " 'where a statute uses a word which has a definite meaning at common law, it will be presumed to be used in that sense and not in the loose popular sense.' " *Thompson v. Community Mental Health Ctrs. of Warren Cty., Inc.,* 71 Ohio St.3d 194, 195, 642 N.E.2d 1102 (1994), quoting *Richardson v. Doe,* 176 Ohio St. 370, 372-373, 199 N.E.2d 878 (1964). For this reason, we have recognized that the General Assembly did not intend to *extinguish* dormant mineral interests outside the chain of title—and beyond discovery in a title search—automatically and by operation of law regardless of the intent of the holder; rather, the 1989 law required a judicial finding that the mineral interest was abandoned and deemed vested in the surface owner. *Albanese* at ¶ 18; *Corban* at ¶ 28 (lead opinion); *id.* at ¶ 88 (Kennedy, J., concurring in part).

{¶ 56} Therefore, under the 1989 law, the General Assembly intended for dormant mineral interests to be terminated within the chain of title and with minimal procedural protections for the mineral-interest holder.

{¶ 57} The legislature provided even more protections to the mineral-interest holder against an involuntary abandonment when it amended the Dormant Mineral Act in 2006 to enact the current version of R.C. 5301.56(E), which provides:

> Before a mineral interest becomes vested under division (B) of this section in the owner of the surface of the lands subject to the interest, the owner of the surface of the lands subject to the interest shall do both of the following:
>
> (1) Serve notice by certified mail, return receipt requested, to each holder or each holder's successors or assignees, at the last

known address of each, of the owner's intent to declare the mineral interest abandoned. If service of notice cannot be completed to any holder, the owner shall publish notice of the owner's intent to declare the mineral interest abandoned at least once in a newspaper of general circulation in each county in which the land that is subject to the interest is located. The notice shall contain all of the information specified in division (F) of this section.

(2) At least thirty, but not later than sixty days after the date on which the notice required under division (E)(1) of this section is served or published, as applicable, file in the office of the county recorder of each county in which the surface of the land that is subject to the interest is located an affidavit of abandonment that contains all of the information specified in division (G) of this section.

{¶ 58} The mineral-interest holder has 60 days from the date of service or publication of the surface owner's intent to declare the mineral interest abandoned to file either a claim to preserve the mineral interest or an affidavit that identifies a saving event that has occurred within the 20 years immediately preceding the date on which the notice was served. R.C. 5301.56(H)(1). Only after the mineral-interest holder has failed to respond can the mineral interest finally be deemed abandoned and vested in the surface owner. R.C. 5301.56(H)(2).

### The Conflicting Amendments

{¶ 59} Having reviewed the text and legislative history of the Marketable Title Act as amended by the Dormant Mineral Act, we consider the question presented by this case: do the Marketable Title Act and the Dormant Mineral Act establish independent, alternative means to terminate severed mineral interests, or

is the Dormant Mineral Act the sole statutory means to reunite such interests with the surface estate?

{¶ 60} R.C. 1.52(B) guides us in answering this question and provides, "If amendments to the same statute are enacted at the same or different sessions of the legislature, one amendment without reference to another, the amendments are to be harmonized, if possible, so that effect may be given to each." It further states, "If the amendments are substantively irreconcilable, the latest in date of enactment prevails. * * * Amendments are irreconcilable only when changes made by each cannot reasonably be put into simultaneous operation."

{¶ 61} By using "abandoned" rather than "extinguished," by creating distinct saving events under the Marketable Title Act and the Dormant Mineral Act, and by enacting a notice provision to protect the mineral-interest holder's property rights, the General Assembly created a specific statutory mechanism to terminate dormant mineral interests that conflicts with and therefore must supersede the Marketable Title Act.

{¶ 62} The Marketable Title Act does not consider the intent of the mineral-interest holder but rather purports to extinguish a qualifying mineral interest even if the owner intended to maintain it—and even if the mineral-interest holder is actively producing oil and gas from it. In contrast, the Dormant Mineral Act focuses on the mineral-interest holder's intent to abandon the unused interest, as manifested by the holder's response or failure to respond to the surface holder's service of its intent to declare the mineral interest abandoned.

{¶ 63} And while the saving events preserving property interests from extinguishment under the Marketable Title Act must appear in the county land records, the Dormant Mineral Act provides saving events that occur wholly outside those records, including the actual production of oil or gas or the use of the mineral interest in underground-gas-storage operations. R.C. 5301.56(B)(3)(b) and (c). These saving events also function differently. If both acts applied to oil-and-gas

interests, a severed mineral interest could be extinguished under the Marketable Title Act absent a saving event after the root of title, yet not be abandoned under the Dormant Mineral Act because a saving event listed in R.C. 5301.56(B)(3) occurred within the preceding 20 years. Or a mineral interest could survive under the Marketable Title Act because it was mentioned in the muniments of title subsequent to the root of title but nonetheless be deemed abandoned due to the lack of a saving event during a subsequent 20-year period.

{¶ 64} Lastly, the Dormant Mineral Act protects the property rights of mineral-interest holders by requiring the service of notice before that interest may be deemed abandoned and vested in the surface owner. R.C. 5301.56(E). In contrast to the Marketable Title Act, which provides no such protection, *see* R.C. 5301.48, the Dormant Mineral Act preserves mineral interests when the owner simply signals its intent to retain them—for example, by exploiting the mineral interest by producing oil and gas or by filing a notice of that intent, *see* R.C. 5301.56(B)(3)(b) and (e). In addition to circumventing these procedural protections, applying the Marketable Title Act and the Dormant Mineral Act simultaneously can create needless confusion among mineral-interest holders and surface owners alike regarding who retains the oil and gas rights. The General Assembly enacted the Dormant Mineral Act to encourage the development of Ohio's oil and gas resources by clearing title to unused mineral interests while preserving the holder's private property. *See* Stewart, *When the Shale Gale Hit Ohio*, 43 Cap.U.L.Rev. at 440-441. Holding that the Marketable Title Act may be used to extinguish oil and gas interests would do nothing more than frustrate the legislature's purposes in enacting the Dormant Mineral Act.

{¶ 65} For all these reasons, the amendments enacted in the Dormant Mineral Act are substantively irreconcilable pursuant to R.C. 1.51 with the 1973 amendment to the Marketable Title Act and cannot reasonably be put into simultaneous operation with it. Further, the Dormant Mineral Act is the more

recent of the amendments. The General Assembly enacted the Marketable Title Act in 1961 and made its provisions applicable to oil-and-gas interests in 1973. The Dormant Mineral Act amended the Marketable Title Act in 1989 and 2006. As the more recent provision, the Dormant Mineral Act controls over the Marketable Title Act and provides the sole statutory mechanism to terminate severed mineral interests in this state.

{¶ 66} Here, the surface owners sought a declaratory judgment that the severed mineral interest had been extinguished by operation of law under the Marketable Title Act. However, even if we assume that there has been no saving event under the Dormant Mineral Act, the surface owners may not reunite the severed mineral interest with the surface estate unless they first comply with the notice and service provisions of R.C. 5301.56(E). There is no evidence that the surface owners have done so here.

{¶ 67} Therefore, I would reverse the judgment of the court of appeals and reinstate the trial court's judgment in favor of the mineral-interest owners. Because the majority does not, I dissent.

DONNELLY, J., concurs in the foregoing opinion.

_____

Yoss Law Office, L.L.C., and Ryan M. Regel, for appellees.

Charles H. Bean, for appellants.

Krugliak, Wilkins, Griffiths & Dougherty Co., L.P.A., Gregory W. Watts, and Matthew W. Onest, urging affirmance for amici curiae Cassandra Ridenour, Senterra, Ltd., David Cain, Julia Cain, Peppertree Farms, L.L.C., Paines Run, L.L.C., Paul E. Morrison, and Vesta G. Morrison.

Theisen Brock, L.P.A., and Daniel P. Corcoran, urging affirmance for amici curiae Allen B. Miller, Matilda J. Miller, Craig M. Miller, Tina E Miller, Brenda D. Thomas, Kevin M. Thomas, Kerry R. Hartline, Mary E. Hartline, Doris Craig, Paul Craig, Eleanor Craig, Nina Ice, Terry Ice, Sheila Stollar, Roger Stollar, Lisa

Meyer, Kenneth Meyer Jr., Helen Craig, Evelyn Craig, Carissa R. Baker, Corey A. Stollar, Shelba Wills, Donald Carl Baker, Debra Kay Bowen, Ruth Ellen Workman, Donna J. Baker Hughes, Ronald Eugene Baker, Linda B. Wilcox, James D. Baker, Lana S. Baker, William Stevens, Danny Offenberger, Jeffrey Stevens, Ricky Allen Baker, Randy Lee Baker, Diana Bohn, Kathy Sue Rainer, Gary Dale Baker, Danny Ray Baker, and Shari Siddle.

Thomas A. Hill and Joseph N. Spano, urging affirmance for amicus curiae Eric Petroleum Corporation.

Jackson Kelly, P.L.L.C., Clay K. Keller, and Andrew N. Schock, urging reversal for amici curiae Ascent Resources-Utica, L.L.C., and Gulfport Energy Corporation.

––––––––––––––––––