[Cite as *Smith v. Towslee*, 2024-Ohio-5786.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Jeffrey S. Smith et al., | : | |
| Plaintiffs-Appellants, | : | No. 24AP-50 |
| | | (C.P.C. No. 21CV-2411) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Martha B. Towslee et al., | : | |
| Defendants-Appellees. | : | |

D E C I S I O N

Rendered on December 10, 2024

**On brief:** *Moore & Yaklevich*, and *John A. Yaklevich*, for appellants. **Argued:** *John A. Yaklevich*.

**On brief:** *Peterson Conners LLP*, *Gregory S. Peterson*, and *Istvan Gajary*, for appellees. **Argued:** *Gregory S. Peterson*.

APPEAL from the Franklin County Court of Common Pleas

JAMISON, J.

**{¶ 1}** Plaintiffs-appellants, Jeffrey S. Smith and Lori J. Smith ("the Smiths"), appeal a judgment of the Franklin County Court of Common Pleas granting the request of defendants-appellees, Martha B. Towslee and Kenneth F. Lorenz, for a judicial dissolution of Sunset Pointe, LLC ("the LLC" or "LLC"), and for a receiver. For the following reasons, we affirm that judgment.

## I. FACTS AND PROCEDURAL HISTORY

**{¶ 2}** The parties are two married couples who were previously friends. Beginning in 2007, the parties vacationed together at a large single-family house located on the shore of Norris Lake in Jacksboro, Tennessee. When the Norris Lake house went on the market in 2017, the parties formed the LLC, an Ohio limited liability company, to purchase and own the house. The LLC purchased the Norris Lake house for $1,458,000 in October 2017.

To finance the purchase, each couple contributed $430,000 in cash, and Jeffrey S. Smith ("Jeffrey"), Towslee, and Lorenz executed a note and mortgage to secure the remaining $616,000 needed for the sale.

{¶ 3} The parties executed an operating agreement to govern the LLC. The operating agreement names each party an LLC member and grants each member a 25 percent interest in the LLC. The operating agreement provides that "[t]he members shall exercise all authority for management and control of the Company pursuant to Section 3.1." (Pls.' Ex. 1, Section 1.7 (definition of "Managing Member").) Under Section 3.1 of the operating agreement:

> All authority for management and control of the Company, it's [sic] assets and operations shall be vested in the Members, the Members shall have the authority, by a majority Vote of Units, on behalf of and for the benefit of the Company to conduct any and all Company business, to take any action or to make any determination on behalf of, and to exercise all authority of the Company.

*Id.* at Section 3.1.

{¶ 4} Additionally, the operating agreement names Jeffrey the managing member of the LLC. The operating agreement states that, "[s]ubject to Section 3.1[,] the Managing Member shall oversee and conduct the day-to-day operations and business of the Company." *Id.* at Section 3.2.

{¶ 5} From October 2017 to January 2021, Jeffrey fulfilled the responsibilities of the managing member. In this role, he managed the rental of the Norris Lake house and the day-to-day maintenance of the property. During this period, Jeffrey shared with the other LLC members access to the LLC's online accounts, including the bank, credit card, and utility accounts.

{¶ 6} While Jeffrey was the managing member, Towslee acted as the LLC's bookkeeper. In May 2020, Towslee received a subpoena requesting documents relating to the LLC. The subpoena arose out of litigation Jeffrey's brother, Steven J. Smith ("Steven"), had filed against Jeffrey in the trial court in February 2018. Steven's verified complaint alleged that he and his brother were both 50 percent owners of The Columbus Lace Cleaning Company ("Columbus Lace"), a family-owned drycleaning business. Jeffrey managed the bookkeeping and accounting functions for Columbus Lace. According to Steven's complaint, Jeffrey used Columbus Lace funds to pay for his family's personal

expenses, and the expenses of his separate business and his son's business. Steven asserted claims against Jeffrey for breach of fiduciary duty, conversion, fraud, and unjust enrichment.

{¶ 7} When Jeffrey did not answer his brother's complaint, the trial court entered default judgment against him. After a hearing, the trial court granted damages against Jeffrey in the amount of $841,107.82. This amount included punitive damages because the trial court found Jeffrey's conduct "particularly egregious * * * [and] borderline criminal." (Defs.' Ex. C1 at 4.) The trial court concluded that, "[i]t is by the grace of the appropriate prosecuting authorities Defendant Jeffrey S. Smith is not facing a felony indictment for his actions as it relates to his blatant pilfering of Columbus Lace's assets." *Id.*

{¶ 8} Steven's attorney subpoenaed documents regarding the LLC while investigating what assets Jeffrey had to satisfy the judgment. After responding to the subpoena, Towslee accessed the record for the fraud action on the trial court's website and read the case documents. The allegations in the complaint "totally shocked" and "really bothered" Towslee. (Apr. 20, 2022 Tr. Vol. II at 287.) She became concerned that Jeffrey may have supplied fraudulent information on the loan application for the Norris Lake house, and she worried that an Internal Revenue Service audit of Jeffrey's tax returns may adversely affect the LLC.

{¶ 9} In a later search of publicly accessible trial court records, Towslee discovered that Steven subsequently sued Lori J. Smith ("Lori"), asserting a claim for fraudulent conveyance. The complaint alleged that Lori was assisting Jeffrey in transferring funds from his accounts into her accounts so Jeffrey could prevent Steven from collecting on his judgment against Jeffrey. Towslee testified that these allegations "caused [her] a concern because this was the first indication that [she] had that [the Smiths] were working together and it -- it took [her] to a place where [she] [] felt like [she] couldn't trust either of them. [She and Lorenz] were already very concerned because neither of [the Smiths] had told [her or Lorenz] about the subpoena, but this really heightened it because [they] felt like [the Smiths] both were hiding a lot from [them]." *Id.* at 295.

{¶ 10} In August 2020, the trial court granted Steven a charging order against Jeffrey's membership interest in the LLC. At that point, Towslee and Lorenz sought out

legal counsel because the situation was "way above anything [they] had ever thought [they] would] have to deal with in [their] lives." *Id*. at 297.

{¶ 11} According to Towslee, Lori did not confide in her that she and Jeffrey were experiencing financial difficulties until late 2020. In early January 2021, Towslee proposed to Lori that Towslee and Lorenz would purchase the Smiths' interests in the LLC to assist them through their financial problems. Towslee also disclosed to Lori that Towslee and Lorenz knew about the judgment against Jeffrey, and Towslee impressed on Lori that they "need[ed] to figure out some solutions for the company, for Sunset Pointe, LLC, to protect the assets." *Id*. at 303. Lori apologized to Towslee and said that she had urged Jeffrey to tell Towslee and Lorenz about the judgment. Lori suggested that Towslee and Jeffrey talk directly.

{¶ 12} Over the next couple of weeks, Towslee and Jeffrey spoke on the phone multiple times. According to Towslee, during these calls, they were "trying to solve the problems with the LLC." *Id*. at 305. Jeffrey contends that in these conversations, Towslee asked him to withdraw from the LLC due to the charging order. Ultimately, Towslee and Lorenz offered to buy the Smiths' interests in the LLC for a total of $150,000. Towslee and Lorenz arrived at that amount by subtracting the amount due on the mortgage from $880,000, the value of the Norris Lake house as listed in a 2017 appraisal. The Smiths, who had initially invested $430,000, did not accept the $150,000 offer. Jeffrey thought Towslee and Lorenz "were trying to lowball" the Smiths. (Apr. 20, 2022 Tr. Vol. I at 85.)

{¶ 13} Towslee recalls she and Lori had a final phone conversation on January 21 or 22, 2021. In that conversation, Lori told Towslee that she and Jeffrey did not want to vacation with Towslee and Lorenz anymore. Lori also said that the Smiths' attorneys had told them that the charging order against Jeffrey's interest in the LLC did not affect the LLC. Towslee replied that the attorney she and Lorenz had hired had informed them that the issuance of the charging order against Jeffrey's interest in the LLC resulted in Jeffrey's involuntary withdrawal from the LLC. Because Jeffrey had involuntarily withdrawn, Towslee said, Lorenz was now the managing member under the terms of the operating agreement. Lori asked, "[S]houldn't it be [Towslee] instead of [Lorenz]?" (Tr. Vol. II at 319.) Towslee agreed, saying that Jeffrey could "not be the managing member now anyway. * * * [I]t's not appropriate * * * because that's him making financial commitments on behalf

of the company, and -- and [she and Lorenz] are not comfortable with that at this point in time." *Id.*

{¶ 14} Soon after this conversation, Towslee and Lorenz changed the passwords on the LLC's accounts so the Smiths could no longer access them. Additionally, Towslee and Lorenz cancelled the credit cards the Smiths had for the charging of LLC expenses. Towslee then took over the duties of managing member.

{¶ 15} In a February 9, 2021 letter to the Smiths' attorney, Towslee and Lorenz's attorney claimed that, under the terms of the operating agreement, Jeffrey had voluntarily withdrawn from the LLC when the trial court entered a charging order against his interest in the LLC. Further, the letter stated that three LLC members remained (Lori, Towslee, and Lorenz) and each held a 33.3 percent interest in the LLC.

{¶ 16} In early February 2021, Lorenz sent Lori an email notifying her of a meeting of the LLC members scheduled for February 22, 2021. Lorenz stated that the purpose of the meeting was to adopt an amended operating agreement, which he attached to the email. The amended operating agreement named three members—Lori, Towslee, and Lorenz— and allocated to each member a 33.3 percent interest in the LLC. The amended operating agreement also named Towslee as managing member. Lori did not attend the meeting. Towslee and Lorenz both signed the amended operating agreement in her absence.

{¶ 17} On March 22, 2021, a notice of satisfaction of judgment was entered in the fraud action Steven had filed against Jeffrey. Two days later, on March 24, 2021, a judgment was issued releasing the charging order against Jeffrey's interest in the LLC.

{¶ 18} Shortly thereafter, on April 19, 2021, the Smiths filed the instant action against Towslee and Lorenz. In the complaint, the Smiths asserted that Towslee and Lorenz breached the LLC's operating agreement, converted two-thirds of Jeffrey's membership interest in the LLC, and breached their fiduciary duties to the LLC. The Smiths requested a declaratory judgment that Jeffrey remained the owner of a 25 percent interest in the LLC and was the managing member of the LLC. Additionally, the Smiths requested an accounting of the LLC's business and financial transactions since January 2021.

{¶ 19} Towslee and Lorenz answered the complaint and filed a counterclaim. The counterclaim asserted claims against the Smiths for breach of the operating agreement, breach of fiduciary duty, and conversion.

{¶ 20} On October 13, 2021, the Smiths moved for a preliminary injunction enjoining Towslee and Lorenz from: (1) continuing to usurp Jeffrey's authority as the managing member of the LLC, (2) claiming ownership of Jeffrey's 25 percent ownership interest in the LLC, and (3) barring the Smiths from access to the LLC's accounts, account information, and business records. After responding to the Smiths' motion, Towslee and Lorenz moved for a judicial dissolution of the LLC pursuant to R.C. 1705.47. Towslee and Lorenz also requested that the trial court appoint a receiver to sell the Norris Lake house. The trial court set both motions for an evidentiary hearing before a magistrate.

{¶ 21} As the litigation proceeded, Towslee continued to act as the LLC's managing member. On November 5, 2021, Towslee and Lorenz notified Jeffrey and Lori of a meeting set for November 8, 2021, to discuss an offer to purchase the Norris Lake house for $1.5 million. Towslee explained that she sent the meeting notice to both Jeffrey and Lori because she was "so confused by all of * * * the issues before the Court based on the case that [was] filed, [so she] just bowed out on making any decisions, and [she] just sent [the notice] to all members of [the LLC]." (Tr. Vol. II at 381.)

{¶ 22} Neither Jeffrey nor Lori attended the November 8, 2021 meeting. Towslee and Lorenz then sent the Smiths a letter informing the Smiths that the $1.5 million offer "merit[ed] serious consideration in that it [was] significantly above appraised value, [was] an all[-]cash offer, and avoid[ed] realtor fees [$90,000], so [both couples would] receive more money back than [their] original investments." (Defs.' Ex. R2.) The letter asked the Smiths to "at least meet to discuss if this opportunity is the most reasonable and cost advantaged way to end the business." *Id.* In response to the letter, the Smiths told Towslee and Lorenz to talk to their lawyer. Although Towslee and Lorenz had previously claimed to have a combined 66.6 percent interest in the LLC, they did not vote their alleged majority interest to accept the offer to purchase the house.

{¶ 23} On February 14, 2022, Towslee and Lorenz notified the Smiths of a meeting set for February 21, 2022, to discuss spring exterior maintenance of the property, seasonal rentals, and needed repairs. Neither Jeffrey nor Lori attended the meeting. On February 25, 2022, Towslee and Lorenz notified the Smiths of a meeting set for March 4, 2022, to discuss expenses and cash flow, suspension of member use of the property until cash flow improved, and amending tax returns for prior years to bring unpaid taxes into compliance.

Neither Jeffrey nor Lori attended. Finally, on March 16, 2022, Towslee and Lorenz notified the Smiths of a meeting set for March 21, 2022, to discuss offers to purchase the Norris Lake house for $1.6 and $1.7 million. Neither Jeffrey nor Lori attended. Towslee and Lorenz did not vote their alleged combined majority interest in the LLC to accept either offer to purchase the house.

{¶ 24} At the hearing before the magistrate, Towslee and Lorenz testified that they would have accepted the offer to purchase the Norris Lake house for $1.7 million. The Smiths, however, testified that they did not want to sell the house, and they would have rejected the $1.7 million offer.

{¶ 25} The parties disagree on more than just the sale of the Norris Lake house. Towslee further testified that she and Lorenz and the Smiths could "no longer agree on anything. The -- the relationships have completely deteriorated. Both business relationships and personal relationships, they're gone. The trust is gone." (Tr. Vol. II at 404.) Lori concurred that discord existed between the Smiths and Towslee and Lorenz. Lori also testified that the parties have disagreed on the operations and management of the LLC "[s]ince [Towslee] stole [the LLC]." (Tr. Vol. I at 239.) Lorenz also testified that the parties can no longer work together due to the breakdown of their relationship: "[G]iven our current relationship with the Smiths, * * * I can't see this going forward. I mean, it's destroyed. Our relationship is completely hammered." (Tr. Vol. II at 578.)

{¶ 26} In a decision issued January 16, 2023, the magistrate recommended that the trial court grant the Smiths the preliminary injunction that they sought. The magistrate also recommended that the trial court grant Towslee and Lorenz's request for the judicial dissolution of the LLC and appoint a receiver to oversee the sale of the Norris Lake house and the winding up of the LLC's affairs.

{¶ 27} Both parties filed objections to the magistrate's decision, although only the Smiths' objections are relevant to this appeal. The Smiths objected to the recommendation that the trial court grant a judicial dissolution of the LLC and appoint a receiver.

{¶ 28} In a judgment entered December 20, 2023, the trial court rejected the Smiths' objections, finding that judicial dissolution of the LLC was appropriate under R.C. 1705.47(B)(3). Under that provision, a trial court could declare a limited liability company dissolved when it was "not otherwise reasonably practicable to carry on the limited liability

company's business in conformity with the operating agreement." 1705.47(B)(3).  The trial court found that "all parties have engaged in conduct related to the LLC which makes it not reasonably practicable to carry on business.  * * * [T]he Court agrees with the following statement from the Magistrate's Decision[:] '[G]iven the 50-50 split among the two couples and the level of distrust and dislike that permeated their testimony, it is hard to see how the LLC can be managed when they so vehemently disagree on issues ranging from who the vendors should be who provide services at the lake house, to whether the lake house should be sold.' "  (Dec. 20, 2023 Order Overruling Objs. and Adopting Mag.'s Decision at 5-6.)  The trial court, therefore, adopted the magistrate's decision, granted Towslee and Lorenz's request for a judicial dissolution of the LLC, and ordered the parties to provide it with names of potential receivers to sell the Norris Lake house and wind up the LLC's affairs.

## II.  ASSIGNMENTS OF ERROR

{¶ 29}  The Smiths now appeal the December 20, 2023 judgment, and they assign the following errors:

> [1.]  THE TRIAL COURT ERRED IN GRANTING APPELLEES' MOTION TO DISSOLVE SUNSET POINTE, LLC.
>
> [2.]  THE TRIAL COURT ERRED IN ORDERING THE APPOINTMENT OF A RECEIVER TO LIQUIDATE THE ASSETS OF SUNSET POINTE, LLC.

## III.  LEGAL ANALYSIS

### A. First Assignment of Error – Judicial Dissolution Under R.C. 1705.47(B)

{¶ 30}  By their first assignment of error, the Smiths argue that the trial court erred in dissolving the LLC pursuant to R.C. 1705.47(B).  We disagree.

{¶ 31}  Pursuant to R.C. 1705.47:

> On application by a member of a limited liability company, the tribunal may declare a limited liability company dissolved, and the limited liability company's business shall be wound up upon the occurrence of any of the following events:
>
> * * *
>
> (B)  A determination by the tribunal that any of the following is true:
>
>> (1)  The economic purpose of the limited liability company is likely to be unreasonably frustrated.

> (2) Another member has engaged in conduct relating to the limited liability company's business that makes it not reasonably practicable to carry on the business with that member.
>
> (3) It is not otherwise reasonably practicable to carry on the limited liability company's business in conformity with the operating agreement.

{¶ 32} R.C. 1705.47 was repealed, effective January 1, 2022. 2019 Am.Sub.S.B. No. 276, Section 3 & 4. In repealing R.C. 1705.47 and other statutes governing limited liability companies, the General Assembly specified that the repeal of the statutes "shall not affect an action commenced, proceeding brought, or right accrued prior to January 1, 2022." 2019 Am.Sub.S.B. No. 276, Section 5. In this case, the parties commenced their actions and Towslee and Lorenz sought relief under R.C. 1705.47 prior to January 1, 2022. Consequently, R.C. 1705.47 applies to this case.

{¶ 33} R.C. 1705.47 states that "the tribunal may declare a limited liability company dissolved" if it determines certain events have occurred. As used in R.C. 1705.47, "tribunal" means "a court," absent another agreed upon definition. R.C. 1705.01(N). The use of the word "may" means that a court has discretion to decide whether to dissolve a limited liability company. *See Miller v. Miller*, 132 Ohio St.3d 424, 2012-Ohio-2928, ¶ 28, quoting *Dorrian v. Scioto Conservancy Dist.*, 27 Ohio St.2d 102, 108 (1971) (holding that the word " ' "may" denotes the granting of discretion' "). Appellate courts review discretionary decisions under an abuse-of-discretion standard. *Mehwald v. Atlantic Tool & Die Co.*, 8th Dist. No. 111692, 2023-Ohio-2778, ¶ 51; *Carter v. Pristine Senior Living & Post-Acute Care, Inc.*, 2d Dist. No. 28381, 2019-Ohio-5010, ¶ 10. An abuse of discretion occurs when a decision is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 34} Initially, the Smiths argue that the trial court could not judicially dissolve the LLC because the operating agreement only allows for termination of the LLC by the majority vote of the members. The Smiths contend that Towslee and Lorenz could not petition the trial court to accomplish what they could not affect through the terms of the operating agreement. We are not persuaded by this argument.

{¶ 35} " 'It is elementary that no valid contract may be made contrary to statute, and that valid, applicable statutory provisions are parts of every contract.' " *Holdeman v.*

*Epperson*, 111 Ohio St.3d 551, 2006-Ohio-6209, ¶ 18, quoting *Bell v. N. Ohio Tel. Co.*, 149 Ohio St. 157, 158 (1948). Consequently, "[p]rovisions in the Ohio Revised Code are read into limited liability company operating agreements, and if inconsistencies exist, the statutes will control." *Darwin Limes, L.L.C. v. Limes*, 6th Dist. No. WD-06-049, 2007-Ohio-2261, ¶ 25.

{¶ 36} Here, when the parties executed the operating agreement in 2017, their agreement included R.C. 1705.47, which was then a valid statutory provision applying to limited liability companies. Under the terms of the operating agreement, therefore, the members could terminate the LLC through a majority vote, *or* a member of the LLC could request a court to judicially dissolve the LLC pursuant to R.C. 1705.47. By allowing termination of the LLC by majority vote, the operating agreement did not preclude judicial dissolution under R.C. 1705.47, as that statutory provision was also part of the operating agreement.

{¶ 37} Next, the Smiths assert that the trial court erred in finding that it was not reasonably practicable to carry on the LLC's business in conformity with the operating agreement. Very little Ohio law addresses whether it is not "reasonably practicable," under R.C. 1705.47(B)(3), for a limited liability company to continue to operate. Without Ohio precedent interpreting R.C. 1705.47(B)(3), we look to Delaware law for guidance. *See In re Cardinal Health, Inc. Derivative Litigation*, 518 F.Supp.3d 1046, 1064 (S.D.Ohio 2021), fn. 7, quoting *In re Keithley Instruments, Inc.*, 599 F.Supp.2d 875, 888 (N.D.Ohio 2008), fn. 10 (" 'Ohio courts routinely look to Delaware case law for guidance in deciding corporate law issues generally.' ").

{¶ 38} Under Delaware law, "[o]n application by or for a member or manager the Court of Chancery may decree dissolution of a limited liability company whenever it is not reasonably practicable to carry on the business in conformity with a limited liability company agreement." Del.Code Ann., Title 6, Section 18-802. Although not completely identical to R.C. 1705.47(B)(3), the Delaware statute contains the same operative language as R.C. 1705.47(B)(3). Both statutes permit a court to dissolve a limited liability company when it is not "reasonably practicable to carry on" the "business in conformity with" the operating agreement. *Compare* R.C. 1705.47(B)(3) *with* Del.Code Ann., Title 6, Section 18-

802.  Given the significant similarities between the Ohio and Delaware statutes, we rely upon the precedent interpreting Delaware's statute to construe R.C. 1705.47(B)(3).

{¶ 39} "The 'not reasonably practicable' standard does not require a petitioner to 'show that the purpose of the limited liability company has been "completely frustrated." ' " *GR Burgr, L.L.C. v. Seibel*, Del.Ch. No. 12825-VCS, 2017 Del. Ch. LEXIS 156, *11-12 (Aug. 25, 2017); quoting *Fisk Ventures, L.L.C. v. Segal*, Del.Ch. No. 3017-CC, 2009 Del. Ch. LEXIS 7, *11 (Jan. 13, 2009), *aff'd*, 984 A.2d 124 (Del.2009), quoting *PC Tower Ctr., Inc. v. Tower Ctr. Dev. Assocs. Ltd. Partnership*, Del.Ch. No. 10788, 1989 Del. Ch. LEXIS 72, *15 (June 8, 1989).  Delaware courts have found the lack of "reasonable practicability" where: (1) the members' vote is deadlocked; (2) the operating agreement gives no means of navigating around the deadlock; and (3) due to the financial condition of the company, there is effectively no business to operate.  *Seokoh, Inc. v. Lard-PT, L.L.C.*, Del.Ch. No. 2020-0613-JRS, 2021 Del. Ch. LEXIS 62, *21-22 (Mar. 30, 2021); *Acela Invests. L.L.C. v. DiFalco*, Del.Ch. No. 2018-0558-AGB, 2019 Del. Ch. LEXIS 175, *64 (May 17, 2019).  None of these factors is individually dispositive; nor must all the factors exist for a court to find it no longer "reasonably practicable" for a business to continue operating.  *Seokoh, Inc.* at *22; *Acela Invests. L.L.C.* at *64.

{¶ 40} "In the context of a dissolution claim, 'deadlock' means disagreement and discord between the parties."  *Acela Invests. L.L.C.* at *67, fn. 276.  "[W]hen an LLC agreement requires that there be agreement between two managers for business decisions to be made, those two managers are deadlocked over serious issues, and the LLC agreement provides no alternative basis for resolving the deadlock, it is not 'reasonably practicable' to carry on the LLC business '*in conformity* with [its] limited liability company agreement.' " (Emphasis sic.)  *Vila v. BVWebTies L.L.C.*, Del.Ch. No. 4308-VCS, 2010 Del. Ch. LEXIS 202, *22 (Oct. 1, 2010), quoting Del.Code Ann., Title 6, Section 18-802.  "Dissolution is appropriate where * * * the two members [] have stopped interacting and are instead engaged in litigation to resolve the disputes, further demonstrating the need for judicial dissolution."  *In re Dissolution of T&S Hardwoods KD, L.L.C.*, Del.Ch. No. 2022-0782-MTZ, 2023 Del. Ch. LEXIS 16, *13 (Jan. 20, 2023).  If a "deadlock cannot be remedied through a legal mechanism set forth within the four corners of the operating agreement,

dissolution becomes the only remedy available as a matter of law." *Fisk Ventures, L.L.C.* at *20.

{¶ 41} The case at bar is factually similar to *Haley v. Talcott*, 864 A.2d 86 (Del.Ch. 2004). In that case, the plaintiff sought to dissolve a limited liability company in which he and the defendant each owned a 50 percent interest. The limited liability company owned real estate, which it leased to a restaurant owned by the defendant and operated by the plaintiff. After a falling out between the plaintiff and the defendant, the plaintiff informed the defendant that, as a 50 percent member of the limited liability company, he wanted to terminate the restaurant's lease and sell the property. However, as a 50 percent member, the plaintiff could not force the limited liability company to take the requested actions because the other 50 percent member—the defendant—opposed them. In finding this deadlock justified dissolution of the limited liability company, the Delaware court rejected the defendant's argument that the limited liability company was still functioning in conformity with its intended purpose because it continued to receive rent payments from the restaurant and meet its obligations under the mortgage. The Delaware court concluded:

> But that reality does not mean that the LLC is operating in accordance with the LLC Agreement. Although the LLC is technically functioning at this point, this operation is purely a residual, inertial status quo that just happens to exclusively benefit one of the 50% members, [the defendant] * * *. With strident disagreement between the parties regarding the appropriate deployment of the asset of the LLC, and open hostility [between the parties] * * *, it is not credible that the LLC could, if necessary, take any important action that required a vote of the members.

*Id.* at 96.

{¶ 42} After finding a deadlock existed, the Delaware court considered whether the limited liability company's agreement contained an equitable alternative to the deadlock. The Delaware court held that, "[w]hen the agreement itself provides a fair opportunity for the dissenting member who disfavors the inertial status quo to exit and receive the fair market value of her interest, it is at least arguable that the limited liability company may still proceed to operate practicably under its contractual charter because the charter itself provides an equitable way to break the impasse." *Id.*

{¶ 43} Although the limited liability company's agreement included an exit mechanism, the Delaware court concluded that the mechanism did not operate equitably.

The exit mechanism could not relieve the plaintiff of his obligation under the personal guaranty that he signed to secure the mortgage on the limited liability company's property. The exit mechanism failed as an adequate remedy because it provided the plaintiff with "no protection over the considerable downside risk that he would have to make good on any future default by the LLC (over whose operations he would have no control) to its mortgage lender." *Id.* at 98. Based on the deadlock and the insufficient exit remedy, the Delaware court found it was not reasonably practicable for the limited liability company to continue to carry on business in conformity with its operating agreement.

{¶ 44} In this case, unlike in other deadlock cases, there are four LLC members, not two. However, the four members consist of two married couples, making two voting units, each with a 50 percent interest in the LLC. The evidence establishes that these two voting units are deadlocked over a serious issue: whether to sell the Norris Lake house, the LLC's sole asset. Towslee and Lorenz want to sell the house; the Smiths do not.

{¶ 45} The Smiths argue that this deadlock is not consequential because Jeffrey, as managing member, can still operate the LLC in conformity with the operating agreement. To address this argument, we must evaluate the extent of the authority granted to the managing member by the operating agreement. As we stated above, Section 3.2 of the operating agreement gives the managing member the authority to "oversee and conduct the day-to-day operations and business of the Company." (Pls.' Ex. 1.) Section 3.2 then provides, "The authority hereby delegated to the Managing Member shall not include the authority to do any of the following without the majority vote of Units," and thereafter lists: (1) change the purpose of the LLC, (2) sell all or substantially all of the LLC assets, (3) purchase an ownership interest in a business entity, (4) mortgage the LLC property, (5) require an additional capital contribution, (6) authorize a voluntary transfer of a member's interest, (7) terminate the LLC, (8) amend the operating agreement, and (9) admit a new member.

{¶ 46} In interpreting a contract, a court seeks primarily to give effect to the intent of the parties, which a court presumes is reflected in the plain language of the contract. *Lubrizol Advanced Materials, Inc. v. Natl. Union Fire Ins. Co.*, 161 Ohio St.3d 1, 2020-Ohio-1579, ¶ 9; *Beverage Holdings, L.L.C. v. 5701 Lombardo, L.L.C.*, 159 Ohio St.3d 194, 2019-Ohio-4716, ¶ 13. If the language of a contract is unambiguous, a court enforces the

contractual terms as written, looking no further than the writing itself to determine the parties' intent. *Lubrizol Advanced Materials, Inc.* at ¶ 9; *Beverage Holdings, L.L.C.* at ¶ 13. Courts give common words in a contract their ordinary meaning unless manifest absurdity results or unless some other meaning is clear from the face or overall contents of the contract. *Beverage Holdings, L.L.C.* at ¶ 13.

{¶ 47} Section 3.2 first defines the managing member's authority as "overseeing and conducting the *day-to-day* operations and business of the Company." (Emphasis added.) (Pls.' Ex. 1.) The phrase "day-to-day" means "occurring each day; daily," and generally refers to frequent or routine matters. *O'Neal v. State*, 167 Ohio St.3d 234, 2021-Ohio-3663, ¶ 46 (further quotation and citation omitted). Thus, Jeffrey can only perform the everyday functions necessary to operate the LLC's business. A majority vote is required to conduct LLC operations or business that is not frequent or routine. (Pls.' Ex. 1, Section 3.1.)

{¶ 48} The second sentence of Section 3.2 lists specific actions—all non-frequent or non-routine—that are "not include[d]" in the managing member's authority. *Id.* The Smiths interpret this sentence as setting forth the exclusive list of actions that are outside the managing member's authority, and thus, subject to a majority vote. But nothing in Section 3.2 states or implies that the listed actions are the only actions not included in the managing member's authority, thus requiring a majority vote of the members. Therefore, the unambiguous language of the operating agreement requires a majority vote to complete those actions listed in Section 3.2 *and* any other non-frequent or non-routine actions necessary to conduct the LLC's operations and business.

{¶ 49} As the trial court found, a high level of animosity and distrust exists between the parties. Towslee and Lorenz distrust the Smiths based on Steven's allegations in the prior litigation, the trial court's findings in that litigation regarding Jeffrey's egregious conduct, and the Smiths' delay in informing them about the judgment and charging order. The Smiths distrust Towslee and Lorenz because they believe Towslee and Lorenz stole Jeffrey's interest in the LLC and Towslee wrongfully usurped Jeffrey's position as managing member. All parties, except for Jeffrey, testified that they can no longer agree on the operation and management of the LLC. Given this situation, we cannot conclude the trial court abused its discretion in finding that the LLC members will not be able to reach a majority on the issues they must decide to manage the LLC. With the LLC members unable

to make business decisions, it is not reasonably practicable to continue the LLC's operations.

{¶ 50} Nevertheless, if the operating agreement contains an equitable exit mechanism, then judicial dissolution is not an appropriate remedy. Section 8.1(b) of the operating agreement permits members to voluntarily transfer their interests in the LLC under certain circumstances, although it operates more like a right of first refusal than a buy-sell agreement. In any event, no exit mechanism could provide Towslee and Lorenz a fair remedy because they personally guaranteed the mortgage on the LLC's property. Consequently, even if Towslee and Lorenz could obtain fair market value for their LLC interests, they would remain obligated to the mortgage lender.

{¶ 51} The parties' deadlock and the lack of a viable exit mechanism demonstrate that it is not reasonably practicable for the LLC's business to continue in conformity with the operating agreement. We thus conclude that the trial court did not abuse its discretion in ordering judicial dissolution pursuant to R.C. 1705.47(B)(3). Accordingly, we overrule the Smiths' first assignment of error.

## B. Second Assignment of Error – Ordering the Appointment of a Receiver

{¶ 52} By their second assignment of error, the Smiths argue that the trial court erred in ordering the appointment of a receiver. We do not address the Smiths' arguments in support of this assignment of error because the Smiths failed to raise them to the trial court.

{¶ 53} A trial court may appoint a receiver: (1) "[a]fter a judgment, to carry the judgment into effect," R.C. 2735.01(A)(4); (2) "[a]fter judgment, to dispose of the property according to the judgment," R.C. 2735.01(A)(5); or (3) "[w]hen a * * * limited liability company * * * has been dissolved," R.C. 2735.01(A)(6). The decision to appoint a receiver is within the discretion of the trial court. *State ex rel. Celebrezze*, 60 Ohio St.3d 69, 66-67 (1991). An appellate court will not reverse the appointment of a receiver absent an abuse of discretion. *Id.* at 67.

{¶ 54} Before the trial court, the Smiths argued that a receiver was unnecessary because judicial dissolution was inappropriate. On appeal, the Smiths pursue different arguments. They contend that the trial court abused its discretion in ordering the appointment of a receiver because: (1) there was no evidence that the appointment of a

receiver was necessary for the preservation of Towslee and Lorenz's rights or that Towslee or Lorenz would suffer irreparable harm if a receiver were not appointed, (2) Towslee and Lorenz did not have clean hands, and (3) appointment of a receiver violated the business-judgment rule. The Smiths did not raise any of these arguments to the trial court. Arguments raised for the first time on appeal are waived or forfeited through the failure to assert them to the trial court. *West v. Bode*, 162 Ohio St.3d 293, 2020-Ohio-5473, ¶ 43; *Premiere Radio Networks, Inc. v. Sandblast, LP*, 10th Dist. No. 18AP-736, 2019-Ohio-4015, ¶ 7. We, therefore, will not consider these arguments. Accordingly, we overrule the Smiths' second assignment of error.

## V. CONCLUSION

{¶ 55} For the foregoing reasons, we overrule the Smiths' two assignments of error, and we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

DORRIAN and LELAND, JJ., concur.

_____